IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
November 1, 2011 Session

**STATE OF TENNESSEE v. JASON LEE WHITE**

**Appeal by Permission from the Court of Criminal Appeals**
**Circuit Court for Montgomery County**
**No. 40800449     Michael R. Jones, Judge**

---

**No. M2009-00941-SC-R11-CD - Filed March 9, 2012**

---

After robbing a Clarksville restaurant, the defendant was indicted for burglary, aggravated robbery, and especially aggravated kidnapping. A jury convicted the defendant on all three counts, after which he filed a motion to set aside the conviction for especially aggravated kidnapping as violative of due process, relying on State v. Anthony, 817 S.W.2d 299 (Tenn. 1991). The trial court denied the motion and sentenced the defendant to an effective twenty-five year term. The Court of Criminal Appeals reversed and dismissed the conviction for especially aggravated kidnapping on due process grounds. This Court granted the State's application for permission to appeal. Following briefing and oral argument, we ordered additional briefing and argument addressing the application of due process principles to dual convictions for kidnapping and an accompanying felony, such as rape or robbery. We hold that the legislature did not intend for the kidnapping statutes to apply to the removal or confinement of a victim that is essentially incidental to an accompanying felony, such as rape or robbery. This inquiry, however, is a question for the jury after appropriate instructions, which appellate courts review under the sufficiency of the evidence standard as the due process safeguard. Because the defendant is entitled to a new trial with specific instructions as to the especially aggravated kidnapping charge, the cause is remanded to the trial court for further proceedings in accordance with this opinion.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Reversed**

GARY R. WADE, J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., JANICE M. HOLDER, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; Gordon W. Smith and Joseph F. Whalen, Associate Solicitors General; Rachel E. Willis, Assistant Attorney General; John

W. Carney, District Attorney General; and Robert Nash, Assistant District Attorney General, for the appellant, State of Tennessee.

R. Lance Miller, Clarksville, Tennessee, for the appellee, Jason Lee White.

Kathy Morante, Nashville, Tennessee; William Crabtree, Knoxville, Tennessee; Garland Erguden, Memphis, Tennessee, for the Amicus Curiae, Tennessee District Attorneys General Conference.

Stephen Ross Johnson, Ann C. Short, and Wade V. Davies, Knoxville, Tennessee, and Aimee D. Solway, Nashville, Tennessee, for the Amicus Curiae, Tennessee Association of Criminal Defense Lawyers.

## OPINION
### Facts & Procedural History

On the night of January 8, 2008, a robbery occurred at a White Castle Restaurant in Clarksville, Tennessee. After reviewing the restaurant's security video, police were able to identify Jason Lee White (the "Defendant") as a suspect. The Defendant, who was indicted for burglary, aggravated robbery, and especially aggravated kidnapping, voluntarily surrendered to the police.

At trial, the proof indicated that the Defendant entered the restaurant shortly before closing and then hid in the men's restroom. Denise Wright, the crew manager, and Penyatta Payne were the only employees on duty. Ms. Wright testified that at approximately 11:55 p.m., she locked the outside doors before checking the restrooms. As she entered the women's restroom, the Defendant approached her from behind, forced her "down on all fours," and kicked her. The Defendant then took the set of keys off of her right arm, ordered her to remain in the restroom, and walked to the employee area in the back of the restaurant where the safe was located. When the Defendant returned, he asked Ms. Wright if she had other keys. She responded that they were in her pocket. At that point, the Defendant pointed a gun to the back of her head and directed her to the employee area where Ms. Payne was unsuccessfully attempting to open the safe. Ms. Wright used her key to gain entry to the safe. The Defendant took a computer monitor, cell phones, and $1,400.00 in cash. As he left the restaurant, the Defendant removed all of the telephones and directed the two women to lie down on the floor and wait eight or nine minutes. After following his instructions, Ms. Wright and Ms. Payne walked to a nearby Wal-Mart to report the crime. Ms. Wright did not see the Defendant's face during the course of the robbery and was unable to identify him in any of a number of photographic line-ups. She did, however, remember that her assailant wore a red hoodie and black pants and that he had claimed that another individual

-2-

participated in the robbery. She otherwise had no knowledge of the involvement of anyone else in the crime.

Ms. Payne, who previously pleaded guilty to accessory after the fact to the robbery, appeared as a witness for the State. She testified that she had known the Defendant for about two years and that the two "ha[d] been intimate once." Ms. Payne stated that the Defendant had called her two or three months before the robbery to ask whether she thought he could rob the restaurant. On the actual date of the robbery, he again asked her about robbing the restaurant. She claimed that when she informed the Defendant that it was not "a good idea" and that "he wouldn't get that much money out of it," he responded that a robbery at that location "might be like taking candy from a baby." At the usual closing time for the restaurant and after the doors had been locked, Ms. Payne was aware that the Defendant was inside the restaurant. As she opened the door to the employee area "and let the door go, [the Defendant] walked in," handed her a key, and directed her to open up the safe. Because he had the wrong key, he left briefly and returned with Ms. Wright. After admitting that she did not initially inform the police who had committed the crime "[b]ecause [she] was scared of . . . what he might do," she identified the Defendant as the perpetrator.

Detective Desmoine Chestnut of the Clarksville Police Department, who investigated the robbery, first questioned both Ms. Wright and Ms. Payne. Meanwhile, another detective, who was creating still photographs from the restaurant's surveillance video, recognized the Defendant. During his review of the video, Detective Chestnut noticed that Ms. Payne had made a phone call from the restaurant and, in contrast to Ms. Wright, "had free reign . . . to come in and out [of the] hallway" during the course of the robbery. Based on this suspicious footage, Detective Chestnut conducted a second interview with Ms. Payne, who acknowledged her connection with the Defendant. Detective Chestnut also found that on the day of the robbery, a number of calls and text messages were exchanged between Ms. Payne's telephone number and a phone number belonging to the Defendant's mother. He also discovered that on the same date, a phone call had been placed from the White Castle telephone number to the number belonging to the Defendant's mother.

The Defendant, who at trial professed his innocence of the crime, claimed he was living with his girlfriend, Amelia Shine, at the time of the robbery and was running a successful business as a freelance photographer. While asserting that he first learned of the robbery from the local newspaper, he insisted that he could not have committed the robbery because he was in bed that night before 10:00 p.m. The Defendant admitted that he had first told police that he did not know Ms. Payne, but explained that he knew her only as "Flower" and "didn't know [her] by her real name." He described Ms. Payne as a marginal acquaintance. The Defendant also testified that he knew who committed the robbery but would not tell the police because "it [was] not [his] job to do their job." On cross-

examination, he admitted that he was known by several different names, including "Jason Broadnax," "Cheerio," and "Oso."

At the conclusion of the proof, the jury returned verdicts of guilt for burglary, aggravated robbery, and especially aggravated kidnapping. Afterward, the Defendant filed a motion to set aside the conviction for especially aggravated kidnapping as violative of due process, arguing that the facts in his case were "remarkably similar" to those in Anthony, 817 S.W.2d at 299, abrogated by State v. Dixon, 957 S.W.2d 532 (Tenn. 1997), where this Court held that dual convictions for armed robbery and aggravated kidnapping, when the latter was essentially incidental to the former, violated constitutional protections.

The trial court, after hearing argument, commented that the issue was "very close frankly," but denied the motion and ruled that because Ms. Wright was subjected to potential harm by being confined to the restroom, the kidnapping was sufficiently distinct from the robbery. The Defendant, sentenced as a Range II offender, received concurrent sentences as follows: six years for burglary, fifteen years for aggravated robbery, and twenty-five years for especially aggravated kidnapping. Because the Defendant was on parole at the time of the offenses, the effective twenty-five year sentence was ordered to be served consecutively to the sentence for which he was on parole.

The Court of Criminal Appeals reversed and dismissed the conviction for especially aggravated kidnapping on due process grounds. State v. White, No. M2009-00941-CCA-R3-CD, 2010 WL 1930951, at *7-8 (Tenn. Crim. App. May 12, 2010). This Court granted the State's application for permission to appeal. The issues initially presented for our review were: (1) whether the Court of Criminal Appeals erred by ruling that the Defendant's especially aggravated kidnapping conviction violated due process; and (2) whether the double jeopardy analysis articulated in State v. Denton, 938 S.W.2d 373 (Tenn. 1996), should be substituted for the due process analysis adopted in Dixon, 957 S.W.2d at 532, when determining whether the proof supports a separate conviction for kidnapping.

Following oral argument, this Court ordered additional briefing and re-argument, seeking the respective positions of the State and the Defendant on the following questions: (1) Is the reasoning in Anthony, 817 S.W.2d at 299, applicable to the current version of the kidnapping statute? (2) When interpreting the kidnapping statute, should this Court rely upon decisions from other jurisdictions in which the applicable kidnapping statutes have been interpreted so as not to include movement that is incidental to the commission of other offenses? (3) If this Court chooses to interpret the kidnapping statute to be inapplicable to movement that is incidental to the commission of another offense, should this issue be submitted to the jury, and if so, what jury instructions should be provided? (4) Based upon principles of constitutional avoidance, should this Court construe Tennessee's kidnapping

-4-

statute to prohibit convictions where the movement of the victim is incidental to the commission of another offense?  (5) Should this Court reconsider whether kidnapping convictions based upon conduct that is incidental to the commission of a separate felony offense violate article I, section 8 of the Tennessee Constitution?  (6) Assuming that such protection is afforded criminal defendants under the Tennessee Constitution, is the two-part test articulated in Dixon or the Anthony test better suited to safeguarding the constitutional interest at stake?  (7) Does the constitutional prohibition against double jeopardy provide an adequate safeguard for the due process interest implicated in cases involving prosecutions for multiple offenses arising out of the same act or transaction, and does the answer depend upon whether the Denton test is retained or the Court adopts the test articulated in Blockburger v. United States, 284 U.S. 299, 304 (1932) or a "Blockburger-plus" approach to double jeopardy?[1]  See State v. White, No. M2009-00941-SC-R11-CD (Tenn. Aug. 23, 2011) (order directing supplemental briefing, inviting amicus curiae participation, and setting re-argument for State v. White, State v. Watkins, and State v. Cross).

In response to the questions posed, the State argues in its appeal that when a defendant is convicted of kidnapping and another offense, it is no longer necessary to engage in a due process analysis because the language of the current kidnapping statutes, all of which incorporate the definition of false imprisonment, removes the possibility that a defendant will be convicted for only slight, trivial movement of a victim incidental to some other offense. Because the restraint necessary to establish any of the kidnapping offenses must constitute a substantial interference with the victim's liberty, but does not require any particular distance or length of time, the State contends that "[t]he question under the current statutes is not whether a restraint was incidental to another crime but whether the restraint interfered substantially with the victim's liberty."  Likewise, the Tennessee District Attorneys General Conference, which submitted an amicus curiae brief at the invitation of this Court, views any problem addressed by Anthony as ameliorated by the current kidnapping statutes and argues that "[a] reviewing court can [e]nsure that the . . . due process rights of the accused are protected by . . . performing a traditional review of the sufficiency of the evidence."

The Defendant contends that the due process test as articulated in Dixon should be retained because a double jeopardy analysis inadequately protects the constitutional interest at stake.  The Tennessee Association of Criminal Defense Lawyers ("TACDL") filed an amicus curiae brief asserting that the revisions to the kidnapping statutes do not resolve the problems addressed in Anthony.  TACDL submits that the Dixon test is too restrictive to accomplish the goal of preventing kidnapping convictions where the movement or restraint

---

[1] The parties in State v. Watkins, No. M2009-00348-SC-R11-CD (Tenn. Aug. 23, 2011) and State v. Cross, No. E2008-02792-SC-R11-CD (Tenn. Aug. 23, 2011) were directed to address questions regarding the propriety of the double jeopardy analysis currently used by our courts.

of the victim is essentially part and parcel of some underlying offense, such as rape or robbery, and urges this Court to return to the Anthony "essentially incidental" test. It also views this question as one of law rather than fact, which is more appropriately addressed by courts.

## Standard of Review

This appeal involves questions of a constitutional dimension, as well as the construction of Tennessee's kidnapping statutes. Both are questions of law, which we review de novo with no presumption of correctness. See Colonial Pipeline Co. v. Morgan, 263 S.W.3d 827, 836 (Tenn. 2008) (providing that "[i]ssues of constitutional interpretation are questions of law," which are reviewed de novo); see also Kiser v. Wolfe, 353 S.W.3d 741, 745 (Tenn. 2011) (characterizing matters of statutory construction as issues of law). "In construing legislative enactments, we presume that every word in a statute has meaning and purpose; each word should be given full effect if the obvious intention of the General Assembly is not violated by so doing." Lawrence Cnty. Educ. Ass'n v. Lawrence Cnty. Bd. of Educ., 244 S.W.3d 302, 309 (Tenn. 2007). If "the statutory language is clear and unambiguous, we apply its plain meaning in its normal and accepted use, without a forced interpretation that would limit or expand the statute's application." Eastman Chem. Co. v. Johnson, 151 S.W.3d 503, 507 (Tenn. 2004). If the statute is ambiguous, however, we may look to other sources, such as the broader statutory scheme and the history of the legislation. In re Estate of Davis, 308 S.W.3d 832, 837 (Tenn. 2010). Further, we presume that an enactment of the General Assembly is constitutional. State v. Pickett, 211 S.W.3d 696, 700 (Tenn. 2007) (quoting Gallaher v. Elam, 104 S.W.3d 455, 459 (Tenn. 2003)). We have a "duty to adopt a construction which will sustain a statute and avoid constitutional conflict if any reasonable construction exists that satisfies the requirements of the Constitution." Davis-Kidd Booksellers, Inc. v. McWherter, 866 S.W.2d 520, 529 (Tenn. 1993).

## Due Process

Article I, section 8 of the Tennessee Constitution provides "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land." Similarly, the Fifth Amendment to the United States Constitution states that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." Likewise, the Fourteenth Amendment to the United States Constitution prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." Although the terminology differs slightly, the phrases "law of the land" and "due process of law" have been construed to mean the same thing. See City of Knoxville v. Entm't Res., LLC, 166 S.W.3d 650, 655 (Tenn. 2005) (noting that the "'law of the land' proviso of our constitution is synonymous with the 'due process of law' provisions of the federal constitution"); 6A Tenn. Jur. Constitutional Law § 75 (2011).

Due process, at its most basic level, "mean[s] fundamental fairness and substantial justice." Vaughn v. State, 456 S.W.2d 879, 883 (Tenn. Crim. App. 1970). Due process acts as a constraint on "both the procedures used by the government and the substance of legislation interfering with personal liberties." 2 Chester James Antieau & William J. Rich, Modern Constitutional Law § 40.00, at 558 (2d ed. 1997) [hereinafter Antieau & Rich]. As to the first constraint, one of the most basic due process requirements "is a fair trial in a fair tribunal." 6A Tenn. Jur. Constitutional Law § 77. This requires, as is pertinent to the case before us, that the State prove each and every element of a criminal offense beyond a reasonable doubt, and if "the evidence is insufficient to support the jury's findings on each element of the offense," a defendant must be acquitted, "as a conviction based on legally insufficient evidence on any element of the charged offense constitutes a denial of due process." 16C C.J.S. Constitutional Law § 1569, at 436 (2005) (footnotes omitted); see also Antieau & Rich, § 40.05, at 568. "[T]he reasonable doubt standard [i]s 'a prime instrument for reducing the risk of convictions resting on factual error' . . . [and] 'is indispensable to command the respect and confidence of the community in applications of the criminal law.'" 3 Joseph G. Cook, Constitutional Rights of the Accused § 20:2, at 20-5 & nn.20-21 (3d ed. 1996) [hereinafter Cook] (quoting In re Winship, 397 U.S. 358, 363, 364 (1970)). As the United States Supreme Court has observed,

> It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned. It is also important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with utmost certainty.

In re Winship, 397 U.S. at 364; see also Jackson v. Virginia, 443 U.S. 307, 317-18 (1979) (noting that Winship "established proof beyond a reasonable doubt as an essential of Fourteenth Amendment due process"). Because a defendant has been afforded due process only when the evidence is sufficient as to each and every element of the crime, it is the responsibility of a reviewing court to carefully address whether the State has met its burden of proof. When, therefore, a defendant challenges the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

It is the task of the legislature, however, not this Court, "'to define what shall constitute a criminal offense and to assess punishment for a particular crime.'" State v. Farner, 66 S.W.3d 188, 200 (Tenn. 2001) (quoting State v. Burdin, 942 S.W.2d 82, 87 (Tenn. 1996)); see also Dowling v. United States, 473 U.S. 207, 214 (1985) (quoting United States

v. Wiltberger, 18 U.S. (5 Wheat.) 76, 95 (1820)) (internal quotation marks omitted) (noting that it is the task of Congress "to define a crime, and ordain its punishment"). This power, however, is "subject to constitutional limitation and safeguards, beyond which the courts do not let the Legislature pass." Hall v. State, 270 S.W. 84, 85 (Tenn. 1925). Due process dictates, "among other things, notice of what the law prohibits." Entm't Res., LLC, 166 S.W.3d at 655. Statutes must give persons "'of ordinary intelligence a reasonable opportunity to know what is prohibited, so that [they] may act accordingly.'" Id. (quoting Grayned v. City of Rockford, 408 U.S. 104, 108 (1972)); see also 1 Cook, § 1:6, at 1-16 ("A conviction for an offense so poorly defined as to leave reasonable doubt whether the conduct of the accused falls within the ambit of the law cannot stand.").

> The fair warning requirement, however, does not demand absolute precision in the drafting of criminal statutes. A statute is not vague which by orderly processes of litigation can be rendered sufficiently definite and certain for purposes of judicial decision. . . . In fact, it is the duty of the courts to adopt a construction which will sustain a statute and avoid constitutional conflict if its recitation permits such a construction.

State v. Burkhart, 58 S.W.3d 694, 697-98 (Tenn. 2001) (citations omitted) (internal quotation marks omitted).

### Kidnapping Offenses and Tennessee Due Process Jurisprudence

In Anthony, 817 S.W.2d at 300, this Court considered "the propriety of a kidnapping conviction [as defined by the 1982 act] where detention of the victim is merely incidental to the commission of another felony, such as robbery or rape." When Anthony was decided in 1991, this Court relied on the Blockburger double jeopardy test, see Anthony, 817 S.W.2d at 302-03, which requires an examination of the offenses to determine "whether each [statutory] provision requires proof of a fact which the other does not." Blockburger, 284 U.S. at 304. Because dual convictions for kidnapping and an accompanying offense arising from the same criminal episode would not generally violate double jeopardy provisions under Blockburger, this Court deemed the double jeopardy analysis as inadequate and, therefore, developed an alternative analysis. Anthony, 817 S.W.2d at 300-01. In Anthony, this Court specifically observed that "the conviction and punishment of a defendant for kidnapping, based on facts insufficient to sustain that conviction, would clearly violate the due process guarantees found in both [the state and federal] constitutions." Id. at 301.

The applicable aggravated kidnapping statute at that time provided, in pertinent part, as follows:

(a) Any person who unlawfully seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away another with the felonious intent to:
>    (1) Cause the other to be confined secretly against his will;
>    (2) Detain the other against his will; or
>    (3) Send the other out of state against his will,
>    shall be guilty of aggravated kidnapping when one or more of the following circumstances are present:
>> (A) The victim is a child under the age of thirteen (13) years;
>> (B) The victim suffers serious bodily injury . . . as a proximate result of the secret confinement, unlawful detention or being sent out of the state;
>> (C) The person secretly confined, unlawfully detained or sent out of the state is the victim of any felony committed on his person during the secret confinement, unlawful detention or carrying out of the state;
>> (D) The secret confinement, unlawful detention or carrying out of the state is accomplished while defendant is armed with a deadly weapon;
>> (E) The secret confinement, unlawful detention or carrying out of the state is for the purpose of obtaining ransom, reward or to commit extortion from the victim or any other person;
>> (F) The secret confinement or unlawful detention is for the purpose of holding the victim hostage or using the victim as a shield; or
>> (G) The victim is mentally incompetent and under the age of eighteen (18) years.

Tenn. Code Ann. § 39-2-301(a) (1982) (repealed 1989).[2]  This Court observed in <u>Anthony</u> that "modern, broadly-drawn kidnapping statutes" created a problem in that they "'could literally overrun several other crimes, notably robbery and rape, . . . since detention and sometimes confinement, against the will of the victim, frequently accompany these crimes.'" <u>Anthony</u>, 817 S.W.2d at 303 (quoting <u>People v. Levy,</u> 204 N.E.2d 842, 844 (N.Y. 1965)). In a footnote accompanying this statement, the Court quoted both the applicable version of the statute and the 1989 amendment, implying that the concerns about broad application

---

[2] A conviction for aggravated kidnapping under this statute provided for "a determinate sentence of life or for a time not less than twenty (20) years." Tenn. Code Ann. § 39-2-301(c). Under this provision, however, "[i]f a person assaults another with intent to commit or attempt to commit aggravated kidnapping, such person shall be punished by confinement in the penitentiary for a determinate sentence of five (5) to fifteen (15) years." Tenn. Code Ann. § 39-2-301(e).

related equally to the newer version.  Anthony, 817 S.W.2d at 303 n.3.  After determining that the majority view among the states was to construe kidnapping statutes as inapplicable "to unlawful confinements or movements incidental to the commission of other felonies," id. at 305, the Court adopted a due process analysis pursuant to article I, section 8 of the Tennessee Constitution that inquired as to whether "the confinement, movement, or detention" supporting the kidnapping offense was "essentially incidental" to the accompanying crime "or whether it [was] significant enough . . . to warrant independent prosecution and . . . [,] therefore, sufficient to support such a conviction."  Id. at 306.  While basing the ruling on state constitutional grounds, this Court also expressed the view that interpreting the statute to preclude convictions where the movement was "essentially incidental" to an accompanying crime was  "fully consistent with the intent of the General Assembly in enacting the prohibition against kidnapping."  Id.

Five years after the ruling in Anthony, this Court developed a unique standard under the Tennessee Constitution for the consideration of double jeopardy claims, a standard which deviated significantly from the federal Blockburger test.  See Denton, 938 S.W.2d at 373. After concluding that the double jeopardy clause of article I, section 10 provided greater protection than the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, this Court outlined a four-factor analysis to determine whether two offenses are the same for double jeopardy purposes.  The analysis required an examination of:  (1) the statutory elements of the offenses pursuant to Blockburger, 284 U.S. at 304; (2) the evidence used to prove the offenses as guided by Duchac v. State, 505 S.W.2d 237, 239 (Tenn. 1973); (3) whether there were multiple victims or discrete acts; and (4) the purposes of the respective statutes.  Denton, 938 S.W.2d at 381.  No factor was deemed to be determinative, and each factor had to be weighed and considered in relation to the others.  Id.  The Court emphasized, however, that the test did not apply when "the legislature has made its intent clear that cumulative punishment is intended."  Id. at 379 n.14.[3]

A year after the Denton ruling, this Court modified the Anthony "essentially incidental" due process analysis.  Dixon, 957 S.W.2d at 535.  The kidnapping statute in force at the time of Dixon was a product of the Criminal Sentencing Reform Act of 1989 ("the Act").  See Anthony, 817 S.W.2d at 303 n.3 (discussing the change to the kidnapping statute).  As a result of the Act, kidnapping, aggravated kidnapping, and especially aggravated kidnapping incorporated the definition of false imprisonment, defined as "knowingly remov[ing] or confin[ing] another unlawfully so as to interfere substantially with the other's liberty."  Tenn. Code Ann. § 39-13-302(a) (1991).  Each of the respective levels

---

[3] Today, in State v. Watkins, __ S.W.3d __, __ (Tenn. 2012), however, this Court concludes that the Denton test has proved to be unworkable, overrules the holding in that case, and returns to the Blockburger standard for double jeopardy analyses.

of kidnapping, therefore, consisted of false imprisonment plus a combination of aggravating factors and increased the level of punishment from a Class C to a Class A felony. See Tenn. Code Ann. §§ 39-13-302 to -305 (1991). In the Dixon opinion, this Court properly observed that "Anthony and its progeny . . . are not meant to provide the rapist a free kidnapping merely because he also committed rape" and noted that the "essentially incidental" standard was designed to "only prevent the injustice which would occur if a defendant could be convicted of kidnapping where the only restraint utilized was that necessary to complete the act of rape or robbery." Dixon, 957 S.W.2d at 534-35. This Court ruled that "any restraint in addition to that which is necessary to consummate rape or robbery may support a separate conviction for kidnapping." Id. at 535. Accordingly, the two-part Dixon test addresses (1) whether the movement or confinement of the victim was beyond that necessary to consummate the accompanying crime; and (2) whether the additional movement or confinement prevented the victim from summoning help, lessened the defendant's risk of detection, or created a significant danger or increased the victim's risk of harm. State v. Richardson, 251 S.W.3d 438, 442-43 (Tenn. 2008). Under the first prong of the Dixon test, the distance of the victim's movement and the duration or place of the victim's confinement were identified as factors to be considered when determining if the movement or confinement was beyond that necessary to consummate the accompanying crime. Richardson, 251 S.W.3d at 443. The second prong of the Dixon test is addressed only if the threshold inquiry in the first prong is satisfied. Richardson, 251 S.W.3d at 442. When each criteria is met, a separate kidnapping conviction is permitted. We subsequently applied Dixon in, among other cases, State v. Cozart, 54 S.W.3d 242, 247 (Tenn. 2001)[4] and State v. Fuller, 172 S.W.3d 533, 537-38 (Tenn. 2005).[5] In Richardson, we explicitly recognized the Dixon two-part test as a replacement for the Anthony "essentially incidental" analysis. 251 S.W.3d at 443.

---

[4] In Cozart, the trial court rejected the defendant's request for a special jury instruction based on Anthony. Cozart, 54 S.W.3d at 244. Because we adhered to the view that the due process analysis stemming from Anthony was "purely a question of law," Cozart, 54 S.W.3d at 247, we agreed with the trial court's refusal to submit the requested instruction to the jury.

[5] In Fuller, the defendant argued that Dixon "improperly changed the question from whether the restraint was 'essentially incidental' to the [accompanying felony] . . . to whether the restraint was 'necessary' to commit the [accompanying felony]." Fuller, 172 S.W.3d at 537. This Court clarified that the first Dixon prong did "not replace the 'essentially incidental' test," but was merely a "threshold determination," and that the Dixon analysis as a whole "provide[d] the structure necessary for applying the principles announced in Anthony." Fuller, 172 S.W.3d at 537. We also explained that satisfaction of the second Dixon prong was not dependent upon "the ultimate success of the confinement," Fuller, 172 S.W.3d at 537, and once again "emphasize[d] that 'the determination of whether a detention or movement is incidental to another offense is highly dependent on the facts in each case.'" Id. at 538 (quoting Anthony, 817 S.W.2d at 306).

**Development of Kidnapping as a Statutory Offense**

At common law, kidnapping was a misdemeanor offense "defined simply as the unlawful confinement and transportation of another out of the country." 3 Wayne R. LaFave, Substantive Criminal Law § 18.1(a), at 4 (2d ed. 2003) [hereinafter LaFave]. "A very substantial displacement [of the victim] was contemplated, one that was significant not only because of distance and difficulties of repatriation, but especially because the victim was removed beyond the reach of English law and effective aid of his associates." Model Penal Code § 212.1 cmt. at 12-13 (Tentative Draft No. 11, 1960) [hereinafter MPC Tentative Draft]; see also 2 Charles E. Torcia, Wharton's Criminal Law § 207, at 492-93 (15th ed. 1994) (describing the offense as "an aggravated form of false imprisonment, since it included not only the elements of that offense, but also the element of carrying the victim out of his own country and beyond the protection of its laws"). In other words, "asportation" was an essential element of the crime, "and there was no doubt about how much asportation would suffice, as the crime was defined so as to require that the victim be taken out of the country." LaFave, § 18.1(b), at 7. As the Connecticut Supreme Court recently observed, "[a]mong the evils that both the common law and later statutory prohibitions against kidnapping sought to address were the isolation of a victim from the protections of society and the law and the special fear and danger inherent in such isolation." State v. Salamon, 949 A.2d 1092, 1114 (Conn. 2008).

After an increase in kidnappings in the 1920s and 1930s, "culminating in the notorious kidnapping of the . . . child of national hero Charles Lindbergh," both federal and state governments directed their attention toward the offense. LaFave, § 18.1(a), at 4; see also MPC Tentative Draft § 212.1 cmt. at 13 (noting that the offense was expanded because it was "apparent that distance and isolation could be achieved within the realm, and that even distance was not essential to isolating a victim from the law and his friends"); Note, A Rationale of the Law of Kidnapping, 53 Colum. L. Rev. 540, 540 (1953). As kidnapping became a creature of statute, it was most often broadly defined and "the common-law asportation requirement was either watered down or eliminated." LaFave, § 18.1(a), at 4. For instance, Tennessee's kidnapping statute, which became effective in 1932,[6] provided that

> [a]ny person who forcibly or unlawfully confines, inveigles, or entices away another, with the intent to cause him to be secretly confined, or imprisoned against his will, or to be sent out of the state against his will, must, on

---

[6] See Brown v. State, 574 S.W.2d 57, 60 & n.1 (Tenn. Crim. App. 1978) (noting that this provision "first appeared in the 1932 revision of the code as section 10794," and that the "statute was adopted by the Legislature, along with other statutes as proposed by the commission on revision, without a separate and specific act on the subject being passed").

conviction, be imprisoned in the penitentiary for not less than two (2) years nor more than ten (10) years.

Tenn. Code Ann. § 39-2-302 (1982) (repealed 1989). This provision was interpreted as requiring "neither secrecy nor asportation [a]s an essential element." Joseph G. Cook, Criminal Law in Tennessee in 1979 – A Critical Survey, 48 Tenn. L. Rev. 1, 6 (1980) (discussing the Court of Criminal Appeals' holding in Brown v. State, 574 S.W.2d at 57).[7] Many states, including Tennessee, enacted statutes proscribing not only kidnapping but also aggravated kidnapping. See, e.g., Tenn. Code Ann. § 39-2-301(a) (aggravated kidnapping) & -302 (simple kidnapping) (1982) (repealed 1989); see also LaFave, § 18.1(a), at 4. In many jurisdictions, kidnapping carried up to a twenty-five year sentence, while aggravated kidnapping frequently provided for sentences of life imprisonment or even death. LaFave, § 18.1(a), at 4. As previously noted, our state's pre-1989 version of aggravated kidnapping provided for longer sentences, no fewer than twenty years and up to a determinate life sentence. Tenn. Code Ann. § 39-2-301(c) (1982) (repealed 1989). A number of scholars criticized statutes such as ours, pointing out that harsh sentences could be imposed for "relatively trivial restraints." LaFave, § 18.1(a), at 5; see also MPC Tentative Draft § 212.1 cmt. at 13 (noting that "the broad scope of [kidnapping] has given rise to serious injustice" because of its use "as an alternative or cumulative treatment of behavior whose chief significance is robbery or rape").

In response to the criticism, the American Law Institute revised the offense of kidnapping in its draft of the Model Penal Code. See Melanie A. Prince, Comment, Two Crimes for the Price of One: The Problem with Kidnapping Statutes in Tennessee and Beyond, 76 Tenn. L. Rev. 789, 790 (2009) [hereinafter Prince, 76 Tenn. L. Rev.]. The Model Penal Code's version "was itself limited to conduct of a most serious nature," LaFave, § 18.1(a), at 5, and was meant "'to effect a major restructuring of the law of kidnapping as it existed at the time the Model Code was drafted.'" John L. Diamond, Kidnapping: A Modern Definition, 13 Am. J. Crim. L. 1, 27 (1985) (quoting Model Penal Code art. 212, introductory note at 208 (1980)). The drafters of the Code sought to "devise a proper system of grading to discriminate between simple false imprisonment and the more terrifying and dangerous abductions for ransom or other felonious purpose." MPC Tentative Draft § 212.1 cmt. at 11. In order to effectuate this purpose, the Code divided restraint-related offenses into three categories. First, false imprisonment, a misdemeanor offense, was defined as when a person "knowingly restrains another unlawfully so as to interfere substantially with his liberty." Model Penal Code § 212.3 (Proposed Official Draft 1962) [hereinafter MPC].

---

[7] This Court "implicitly approved of the holding in Brown[ v. State]" in State v. Henderson, 620 S.W.2d 484, 486-87 (Tenn. 1981). Anthony, 817 S.W.2d at 304 n.5.

-13-

Second, felonious restraint, a felony in the third degree,[8] defined as when a person knowingly "(a) restrains another unlawfully in circumstances exposing him to risk of serious bodily injury; or (b) holds another in a condition of involuntary servitude," MPC § 212.2, was meant to "provide[] penalties intermediate between those for kidnapping and false imprisonment" based upon the fact that "the victim is not isolated, in danger of death, nor necessarily terrorized." MPC Tentative Draft § 212.2 cmt. at 21. Third, kidnapping, the most egregious, was defined as follows:

> A person is guilty of kidnapping if he unlawfully[9] removes another from his place of residence or business, or a substantial distance from the vicinity where he is found, or if he unlawfully confines another for a substantial period in a place of isolation, with any of the following purposes:
> (a) to hold for ransom or reward, or as a shield or hostage; or
> (b) to facilitate commission of any felony or flight thereafter; or
> (c) to inflict bodily injury on or to terrorize the victim or another; or
> (d) to interfere with the performance of any governmental or political function.

MPC § 212.1. In essence, the Model Penal Code's version of kidnapping contained three major requirements: (1) "the requisite removal or confinement [must] be substantial in nature," LaFave, § 18.1(a), at 5; (2) "one of the specifically enumerated purposes" must be established, United States v. Gonzalez-Ramirez, 477 F.3d 310, 316 (5th Cir. 2007); and (3) "the removal or confinement must be 'unlawfully' done," LaFave, § 18.1(a), at 5. Kidnapping was classified by the Model Penal Code as a felony of the first degree, for which "the minimum [sentence] shall be fixed by the Court at not less than one year nor more than ten years, and the maximum . . . shall be life imprisonment[.]" MPC § 6.06(1).[10] In support of their decision to restrict kidnapping's scope, the drafters cited to examples of

---

[8] The maximum sentence for a felony in the third degree, as provided by the Code, is ten years. See MPC § 6.07(3).

[9] The kidnapping provision specifies that

[a] removal or confinement is unlawful within the meaning of this Section if it is accomplished by force, threat or deception, or, in the case of a person who is under the age of 14 or incompetent, if it is accomplished without the consent of a parent, guardian or other person responsible for general supervision of his welfare.

MPC § 212.1.

[10] If the victim is voluntarily released alive "and in a safe place prior to trial," the offense is a felony of the second degree. MPC § 212.1.

"abusive prosecution" in the context of securing kidnapping convictions, specifically when used as a "means to secure a death sentence or life imprisonment for behavior that amounts in substance to robbery or rape," which they acknowledged was influenced by "public clamor for the extreme penalty" when "an especially outrageous crime [wa]s committed." MPC Tentative Draft § 212.1 cmt. at 13-14.

The Model Penal Code "had considerable influence upon subsequent legislative action in this area," LaFave, § 18.1(a), at 5, although "[w]here the model statute falls in the kidnapping statutory scheme of each state varies." Prince, 76 Tenn. L. Rev. at 806. Some jurisdictions have chosen to model their kidnapping statutes largely on the Model Penal Code, see, e.g., Mo. Ann. Stat. § 565.110 (West, Westlaw through 2011 First Extraordinary Sess. of the 96th Gen. Assemb.), or incorporate the Model Penal Code's requirement that the kidnapping be committed for a specific purpose, see, e.g., Alaska Stat. Ann. § 11.41.300(a)(1) (West, Westlaw through 2011 of the First Reg. Sess. & First Spec. Sess. of the 27th Leg.); Ky. Rev. Stat. Ann. § 509.040(1)(a)–(f) (West, Westlaw through 2011 legis.). Other states have chosen to enact multiple statutes that distinguish between types of kidnappings by degree, aggravating factors, or based upon victim safety. LaFave, § 18.1(a), at 5; see also, e.g., Ala. Code §§ 13A-6-43 to -44 (West, Westlaw through 2011 Reg. Sess.); Utah Code Ann. §§ 76-5-301 to -302 (West, Westlaw through 2011 Third Spec. Sess.).

While some jurisdictions revised their respective kidnapping statutes to circumscribe their reach, even "states enacting versions of the Model Penal Code kidnapping statute still experience[d] problems with multiple convictions for kidnapping and [an] underlying crime." Prince, 76 Tenn. L. Rev. at 807. As a result, "[c]ontraction of the scope of kidnapping law also [has been] effected through the courts." Salamon, 949 A.2d at 1115. The majority of jurisdictions, which since the Anthony ruling has included Tennessee, have construed kidnapping statutes as inapplicable "to unlawful confinements or movements 'incidental' to the commission of other felonies." Frank J. Wozniak, Annotation, Seizure or Detention for Purpose of Committing Rape, Robbery, or Other Offense as Constituting Separate Crime of Kidnapping, 39 A.L.R. 5th 283, 356 (1996) [hereinafter Wozniak, 39 A.L.R. 5th]; see also Salamon, 949 A.2d at 1117 (holding that the legislature "intended to exclude from the scope of the more serious crime of kidnapping and its accompanying severe penalties those confinements or movements of a victim that are merely incidental to and necessary for the commission of another crime against that victim"). A minority of jurisdictions, however, "under the applicable state law, [allow] one [to] be convicted for kidnapping even though the confinement is related or incidental to the commission of other criminal acts." Wozniak, 39 A.L.R. 5th at 356; see, e.g., Hines v. State, 75 S.W.3d 444, 448 (Tex. Crim. App. 2002) (observing that "[t]here is nothing in the statute indicating that the Legislature intended to bar the prosecution of a kidnapping that is part and parcel of another offense").

**Kidnapping Statutes in Tennessee**

Against this historical backdrop, the Tennessee Sentencing Commission originally proposed that the General Assembly adopt three restraint-related offenses: (1) false imprisonment; (2) kidnapping; and (3) aggravated kidnapping. False imprisonment was defined as "knowingly remov[ing] or confin[ing] another unlawfully so as to interfere substantially with the other's liberty." Tennessee Sentencing Comm'n, Proposed Revised Criminal Code Book II, at 95 (1988) [hereinafter Proposed Revised Criminal Code]. Kidnapping was defined as "knowingly[] (1) [u]nlawfully remov[ing] or confin[ing] another in circumstances exposing another person to substantial risk of bodily injury; or (2) [u]nlawfully confin[ing] another in a condition of involuntary servitude," and was derived from Model Penal Code section 212.2. Proposed Revised Criminal Code at 95. Aggravated kidnapping, derived from Model Penal Code section 212.1, was defined as the unlawful removal or confinement of another:

(1) To hold for ransom or reward, or as a shield or hostage; or
(2) To facilitate commission of any felony or flight thereafter; or
(3) To inflict serious bodily injury on or to terrorize the victim or another; or
(4) To interfere with the performance of any governmental or political function; or
(5) While armed with a deadly weapon.

Proposed Revised Criminal Code at 94. The penalty for this offense was reduced from a Class A to a Class B felony "if the victim [wa]s voluntarily released alive and in a safe place prior to trial," which, the Sentencing Commission observed, "effectuate[d] the primary concern for safety of the victim." Id. cmt. The General Assembly enacted these offenses, as proposed, in 1989. See Act of May 24, 1989, ch. 591, § 1, 1989 Tenn. Pub. Acts 1203.

In 1990, the General Assembly modified these provisions, as reflected in the current versions of the offenses. See Act of April 12, 1990, ch. 982, 1990 Tenn. Pub. Acts 613, 613-14 (codified as amended at Tenn. Code Ann. §§ 39-13-302 to -305 (2010)). Our kidnapping statutes use the offense of false imprisonment "as a definitional building block for the statutes that directly address kidnapping and its aggravating factors." Prince, 76 Tenn. L. Rev. at 791; see also Tenn. Code Ann. § 39-13-302, Sentencing Comm'n cmts. (2010) (describing false imprisonment as "the basic offense for the kidnapping statutes"). This state's version of false imprisonment is defined as when "[a] person . . . knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a) (2006). "Unlawful" is defined as a

removal or confinement . . . that is accomplished by force, threat or fraud, or, in the case of a person who is under the age of thirteen (13) or incompetent,

accomplished without the consent of a parent, guardian or other person responsible for the general supervision of the minor's or incompetent's welfare.

Tenn. Code Ann. § 39-13-301(2) (2006) (current version at Tenn. Code Ann. § 39-13-301(12) (2010)). As the Sentencing Commission Comments to Tennessee Code Annotated section 39-13-302(a) clarify, false imprisonment is meant to "broadly address[] any situation where there is an interference with another's liberty." It is important to note, however, that while the Model Penal Code's definition of false imprisonment only requires restraint, Tennessee's definition requires removal or confinement. Compare Tenn. Code Ann. § 39-13-302(a) (defining the offense as when a person "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty") with MPC § 212.3 (defining the offense as when "[a] person . . . knowingly restrains another unlawfully so as to interfere substantially with his liberty").

Our kidnapping statutes deviate from the Model Penal Code in two primary ways. First, our statutes proscribe kidnapping at three levels. While each of the offenses is founded upon the definition of false imprisonment, a Class A misdemeanor, the level of punishment for false imprisonment increases when combined with aggravating factors. Kidnapping, a Class C felony, is a false imprisonment "(1) [u]nder circumstances exposing the other person to substantial risk of bodily injury; or (2) [w]here the confinement of another is in a condition of involuntary servitude." Tenn. Code Ann. § 39-13-303(a) (2006).[11] This offense, quite similar to the Model Penal Code's felonious restraint offense, is designed in degree of culpability to fall somewhere in between misdemeanor false imprisonment and aggravated kidnapping. Aggravated kidnapping is a false imprisonment committed:

(1) To facilitate the commission of any felony or flight thereafter;
(2) To interfere with the performance of any governmental or political function;
(3) With the intent to inflict serious bodily injury on or to terrorize the victim or another;
(4) Where the victim suffers bodily injury; or
(5) While the defendant is in possession of a deadly weapon or threatens the use of a deadly weapon.

---

[11] The kidnapping statute has been amended to include only false imprisonment under circumstances exposing the victim to substantial risk of bodily injury. See Tenn. Code Ann. § 39-13-303(a) (Supp. 2008).

Tenn. Code Ann. § 39-13-304(a) (2006).  Subsections (1), (2), and (3) are drawn from the Model Penal Code's kidnapping provision.  See MPC § 212.1(b)–(d).  Aggravated kidnapping is a Class B felony, Tenn. Code Ann. § 39-13-304(b)(1) (2006), although "[i]f the offender voluntarily releases the victim alive or voluntarily provides information leading to the victim's safe release, such actions shall be considered by the court as a mitigating factor at the time of sentencing."  Tenn. Code Ann. § 39-13-304(b)(2).  Especially aggravated kidnapping, the most serious of the kidnapping offenses, is a false imprisonment

> (1) Accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon;
> (2) Where the victim was under the age of thirteen (13) at the time of the removal or confinement;
> (3) Committed to hold the victim for ransom or reward, or as a shield or hostage; or
> (4) Where the victim suffers serious bodily injury.

Tenn. Code Ann. § 39-13-305(a) (2006).  Although only the aggravating factor contained in subsection (3) is derived from the Model Penal Code, see MPC § 212.1(a), this statute clearly focuses on those instances in which the defendant's "behavior [is] specially terrifying and dangerous."  MPC Tentative Draft § 212.1 cmt. at 15. Especially aggravated kidnapping is a Class A felony.  Tenn. Code Ann. § 39-13-305(b)(1) (2006).  As with aggravated kidnapping, either providing information leading to the victim's safe release or the voluntary release of the victim are acts that must be considered as a mitigating factor at sentencing. See Tenn. Code Ann. § 39-13-305(b)(2).

A second difference between our statutes and the Model Penal Code, and the most significant as it relates to the issue before us, is the quality of the movement that will satisfy the respective statutes.  Under the Model Penal Code, the victim must be removed *from his place of residence or business*, *a substantial distance from the place he is found*, or confined *in a place of isolation for a substantial period of time*.  MPC § 212.1.  Distance or time is an essential component.   In contrast, none of our kidnapping provisions require proof of a specific distance or period of time. Cf. Dixon, 957 S.W.2d at 535 (noting that, with regard to aggravated kidnapping, "it is the purpose of the removal or confinement and not the distance or duration that supplies a necessary element of aggravated kidnapping").  Instead, by using misdemeanor false imprisonment as the "building block" for kidnapping offenses, our statutes require only that a defendant "knowingly removes or confines another unlawfully so as to *interfere substantially with the other's liberty*."  Tenn. Code Ann. § 39-13-302(a) (emphasis added).

While not as specific as the provisions of the Model Penal Code, our statutes are not intended to criminalize trivial restraints. "Substantial" is defined as "considerable in quantity" or "significantly large." Webster's Ninth New Collegiate Dictionary 1176 (1991). A "significantly large" interference with one's liberty would seem to necessarily include a time or distance component. Based on the chosen terminology, it appears that the General Assembly had in mind a removal or confinement that is similar to that which is contemplated by the Model Penal Code, although not as explicitly defined. Cf. Gonzalez-Ramirez, 477 F.3d at 318 (stating that "[t]he conduct proscribed by Tennessee's kidnapping statute cannot be characterized as 'relatively trivial restraints'").[12]

While the Court in Anthony rested its holding on constitutional grounds, legislative intent and the strict construction of criminal statutes were also guiding principles. 817 S.W.2d at 306. The Court observed that its "task [wa]s to apply the statute narrowly, so as to make its reach fundamentally fair and to protect . . . due process rights." Id. Of course, "[p]rior Tennessee law required penal statutes to be strictly construed," Tenn. Code Ann. § 39-11-104, Sentencing Comm'n cmts. (Supp. 1990), but the revisions to the Criminal Code state that they are now to "be construed according to the fair import of their terms, including reference to judicial decisions and common law interpretations, to promote justice, and effect the objectives of the criminal code." Tenn. Code Ann. § 39-11-104 (Supp. 1990); see also State v. Campbell, 245 S.W.3d 331, 337 (Tenn. 2008).[13] In our view, the kidnapping statutes, "construed according to the fair import of their terms," Tenn. Code Ann. § 39-11-104, and coupled with their derivation from the Model Penal Code, evince a legislative intent to punish as kidnapping only those instances in which the removal or confinement has criminal significance above and beyond that necessary to consummate some underlying offense, such as robbery or rape.

In 2008, the Connecticut Supreme Court observed that "[w]hether the movement or confinement of the victim is merely incidental to and necessary for another crime will depend on the particular facts and circumstances of each case." Salamon, 949 A.2d at 1120. Describing the issue as primarily one for the jury, the Connecticut high court ruled that "when the evidence reasonably supports a finding that the restraint was not merely incidental

_____

[12] See also id. at 320-21 (noting that the false imprisonment definition's requirement that the removal or confinement be "unlawfully" committed, meaning that it is accomplished, as is pertinent to this case, "by force, threat or fraud," Tenn. Code Ann. § 39-13-301(2), "is significant," as this requirement, "along with the additional aggravating elements," serves to "distinguish Tennessee's kidnapping statute from the lesser offenses identified by the Model Penal Code and criminalized in Tennessee and other states").

[13] But see State v. Alford, 970 S.W.2d 944, 947 (Tenn. 1998) (invoking "the rule of statutory construction which requires that criminal statutes be strictly construed in favor of the defendant" after the passage of the 1989 Act).

to the commission of some other, separate crime, <u>the ultimate factual determination must be made by the jury</u>." <u>Id.</u> at 1120-21 (second emphasis added). The holding articulated relevant factors for the jury to consider in making this determination, some of which are contained in the second prong of the due process test as articulated in <u>Dixon</u>, <u>see</u> 957 S.W.2d at 535:

> [T]he jury should be instructed to consider the various relevant factors, including the nature and duration of the victim's movement or confinement by the defendant, whether th[e] movement or confinement occurred during the commission of the separate offense, whether the restraint was inherent in the nature of the separate offense, whether the restraint prevented the victim from summoning assistance, whether the restraint reduced the defendant's risk of detection and whether the restraint created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense.

<u>Salamon</u>, 949 A.2d at 1120-21. The Texas Court of Criminal Appeals, that state's highest court of criminal jurisdiction, has also concluded that "[i]t is up to the jury to distinguish between those situations in which a substantial interference with the victim's liberty has taken place and those situations in which a slight interference has taken place." <u>Hines</u>, 75 S.W.3d at 448.[14]

Guided by principles expressed in these opinions, we have concluded that whether the evidence, beyond a reasonable doubt, establishes each and every element of kidnapping, as defined by statute, is a question for the jury properly instructed under the law. Cf. <u>State v. Howard</u>, 30 S.W.3d 271, 277 (Tenn. 2000) (holding that the question of whether a premeditated murder was a natural and probable consequence of a robbery is a finding of fact for a properly instructed jury to determine). The jury, whose primary obligation is to ensure that a criminal defendant has been afforded due process, must evaluate the proof offered at trial and determine whether the State has met its burden. Cf. <u>Jackson</u>, 443 U.S. at 316 (observing that "an essential [part] of the due process guaranteed by the Fourteenth Amendment [is the requirement] that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof[, ]defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense"). Our task, therefore, of assessing the sufficiency of the convicting evidence qualifies as the ultimate component of this constitutional safeguard. Cf. <u>Hines</u>, 75 S.W.3d at 448 (explaining that the job of the appellate court in reviewing a conviction is to "act as a final, due process

---

[14] As noted previously, the Texas court declined to adopt an interpretation of the kidnapping statute that would render it inapplicable to movement or confinement that was "part and parcel of another offense." <u>Id.</u> While we are not persuaded by this aspect of the Texas court's analysis, we agree with its observation that the nature of a kidnapping victim's movement or confinement is a question for the jury.

safeguard"). The separate due process test articulated first in <u>Anthony</u>, and subsequently refined in <u>Dixon</u> and its progeny, is, therefore, no longer necessary to the appellate review of a kidnapping conviction accompanied by a separate felony. To be clear, <u>Anthony</u> and the entire line of cases including a separate due process analysis in appellate review are expressly overruled.

Under the standard we adopt today, trial courts have the obligation to provide clear guidance to the jury with regard to the statutory language. Specifically, trial courts must ensure that juries return kidnapping convictions only in those instances in which the victim's removal or confinement exceeds that which is necessary to accomplish the accompanying felony. Instructions should be designed to effectuate the intent of the General Assembly to criminalize only those instances in which the removal or confinement of a victim is independently significant from an accompanying felony, such as rape or robbery. When jurors are called upon to determine whether the State has proven beyond a reasonable doubt the elements of kidnapping, aggravated kidnapping, or especially aggravated kidnapping, trial courts should specifically require a determination of whether the removal or confinement is, in essence, incidental to the accompanying felony or, in the alternative, is significant enough, standing alone, to support a conviction. In our view, an instruction of this nature is necessary in order to assure that juries properly afford constitutional due process protections to those on trial for kidnapping and an accompanying felony.

We emphasize, however, that since our 1991 decision in <u>Anthony</u>, convictions for kidnapping have been precluded when the victim's movement or confinement was essentially incidental to another felony. Our decision, therefore, should not be construed as creating a new standard for kidnapping. Instead, we are merely providing definition for the element of the offense requiring that the removal or confinement constitute a substantial interference with the victim's liberty. Cf. <u>State v. Brown</u>, 836 S.W.2d 530, 543 (Tenn. 1992), <u>superseded by statute on other grounds as stated in</u> <u>State v. Harrell</u>, No. E2005-01531-CCA-R3-CD, 2007 WL 595885, at *6 (Tenn. Crim. App. Feb. 26, 2007) (defining, for purposes of first-degree murder, the statutory elements of premeditation and deliberation, and holding that "[i]t is consistent with the murder statute and with case law in Tennessee" to instruct the jury accordingly). Furthermore, the change requires the jury to ascertain, in the first instance, whether the movement or confinement of the victim was "essentially incidental" to that which is part of an accompanying offense. In consequence, our ruling does not articulate a new rule of constitutional law or require retroactive application. Cf. <u>Miller v. State</u>, 54 S.W.3d 743, 746-47 (Tenn. 2001) (holding that <u>State v. Brown</u>'s clarification regarding the definitions of premeditation and deliberation did not announce a new rule of constitutional law, but "simply reiterated that Tennessee law had for many years required proof of <u>both</u> premeditation and deliberation to sustain a conviction of first-degree murder").

We must now determine whether the evidence presented in this case is sufficient to sustain a conviction for especially aggravated kidnapping. The disposition in Salamon by the Connecticut Supreme Court provides direction. In Salamon, the defendant approached the fifteen-year-old female victim as she stepped off of a train at night. 949 A.2d at 1101. As the victim was ascending some stairs, the defendant grabbed her by the back of the neck, causing her to fall down, and when she screamed, the defendant punched her once in the mouth and "attempted to thrust his fingers down her throat" in an apparent effort to thwart any vocalization of her fears. Id. She testified that she was restrained in such a manner "for five minutes or more." Id. at 1121. After being charged with kidnapping in the second degree, unlawful restraint in the first degree, and risk of injury to a child, the defendant was convicted at trial on all three counts. Id. at 1102. On appeal, the defendant claimed that his kidnapping conviction should be reversed "because, contrary to the controlling precedent, the jury should have been instructed to find the defendant not guilty . . . if it first found that the . . . restraint of the victim in connection with the kidnapping was incidental to [his] restraint . . . in connection with his assault of the victim." Id. After determining that the legislature did not intend the kidnapping statute to apply to "those confinements or movements of a victim that are merely incidental to and necessary for the commission of another crime against the victim," id. at 1117, the Connecticut court reviewed the evidence in light of the defendant's argument that "no juror reasonably could conclude that the restraint imposed on the victim was not incidental to the restraint used in connection with the assault." Id. at 1121. While observing that a jury could have found that the defendant's restraint of the victim was not merely incidental to his assault, the court granted a new trial on the kidnapping charge, as the question of "[w]hether [his] conduct constituted a kidnapping . . . [wa]s a factual [one] for determination by a properly instructed jury." Id. at 1121-22.[15]

The proof in this case demonstrated that the Defendant approached Ms. Wright in the women's restroom from behind with a gun, forced her "down on all fours," and kicked her. After taking the set of keys from her right arm in an effort to gain entry to the restaurant's safe, he ordered her to remain in the restroom. When the Defendant returned, he inquired whether she had other keys. When Ms. Wright responded that she had keys in her pocket, he forced her at gunpoint to accompany him to the safe. In our view, this proof could be interpreted in different ways and, therefore, the determination of whether the removal or confinement of Ms. Wright constituted a substantial interference with her liberty was a question of fact for the jury to resolve.

---

[15] The court clarified that the jury was to be instructed that "if it finds that the defendant's restraint of the victim was merely incidental to the defendant's commission of another crime against the victim, that is, assault, then it must find the defendant not guilty of the crime of kidnapping." Id. at 1122.

At the conclusion of trial, the trial court instructed the jury on especially aggravated kidnapping as follows:

> For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:
> (1) that the defendant knowingly removed or confined another unlawfully so as to interfere substantially with the other's liberty
> and
> (2) that the confinement or removal was accomplished with a deadly weapon or by display of any article used or fashioned to lead the alleged victim to reasonably believe it was a deadly weapon.

The jury also received instructions on the lesser-included offenses of aggravated kidnapping,[16] kidnapping,[17] and false imprisonment,[18] as well as the definitions applicable to these statutory provisions.[19] While these instructions track the statutory language, they did not define the key element—the substantial interference with the victim's liberty—as requiring a finding by the jury that the victim's removal or confinement was not essentially incidental to the accompanying felony offense. Because the jury was not properly instructed on the question of whether the victim's removal or confinement was essentially incidental to an accompanying felony, the Defendant is entitled to a new trial on the especially aggravated kidnapping charge.[20]

---

[16] The instruction required the jury to find that the State had proven beyond a reasonable doubt "(1) that the defendant knowingly removed or confined another unlawfully so as to interfere substantially with the other's liberty; and (2) that the defendant possessed or threatened the use of a deadly weapon[.]"

[17] The instruction required the jury to find that the State had proven beyond a reasonable doubt "(1) that the defendant knowingly removed or confined another unlawfully so as to interfere substantially with the other's liberty; and (2) that the removal or confinement was under circumstances that exposed the other to substantial risk of bodily injury[.]"

[18] The instruction required the jury to find that the State had proven beyond a reasonable doubt "(1) that the defendant removed or confined another unlawfully so as to interfere substantially with the other's liberty; and (2) that the defendant acted knowingly."

[19] These included, among others, the definitions for "unlawful," "force," "deadly weapon," "bodily injury," "intentionally," "knowingly," and "force."

[20] Because we cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the instructional error, we cannot find the error harmless. See Howard, 30 S.W.3d at 277 n.6. The guarantee against double jeopardy does not preclude a retrial, however, because the reversal is based on instructional error. See id. at 277.

In an effort to provide appropriate guidance to the trial court, we hold that the instruction to the jury on the "substantial interference" element should provide as follows:[21]

To establish whether the defendant's removal or confinement of the victim constituted a substantial interference with his or her liberty, the State must prove that the removal or confinement was to a greater degree than that necessary to commit the offense of [insert offense],[22] which is the other offense charged in this case. In making this determination, you may consider all the relevant facts and circumstances of the case, including, but not limited to, the following factors:

- the nature and duration of the victim's removal or confinement by the defendant;

- whether the removal or confinement occurred during the commission of the separate offense;

- whether the interference with the victim's liberty was inherent in the nature of the separate offense;

- whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so;

- whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and

- whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense.

---

[21] In State v. Harrison, 270 S.W.3d 21, 35-36 (Tenn. 2008), we ruled similarly in a case in which we articulated an interim rule governing the discovery of mental health information in the context of pretrial competency hearings. Rather than "[s]imply remanding . . . to the trial court for further proceedings," we chose to "exercise our inherent supervisory authority over Tennessee's judicial system to adopt temporary procedures governing the discovery and disclosure of evidence in pretrial competency proceedings in criminal cases." Id. at 36.

[22] Of course, for purposes of the remand in this case, the offense is aggravated robbery.

-24-

We invite the Tennessee Pattern Jury Instruction Committee to promulgate a pattern jury instruction for those trials in which a defendant is indicted for kidnapping and an accompanying felony. Until the development of an appropriate instruction, however, the language articulated herein shall apply. Cf. Harrison, 270 S.W.3d at 36 (holding that temporary procedures governing the discovery of mental health information in the context of pretrial competency hearings "shall remain in effect until the adoption of a rule specifically governing the discovery and disclosure of evidence in a pretrial competency hearing in a criminal case").

## Conclusion

In our view, the General Assembly did not intend for the kidnapping statutes to apply to a removal or confinement of a victim that is "essentially incidental" to that of an accompanying felony, such as rape or robbery. Because the question of whether a victim's removal or confinement was essentially incidental to an accompanying felony is one for the jury, we hold that the Defendant is entitled to a new trial with the appropriate instructions as to the especially aggravated kidnapping charge. The cause is, therefore, remanded to the trial court for further proceedings in accordance with this opinion. The costs are taxed to the State.

_____
GARY R. WADE, JUSTICE