# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### August 7, 2012 Session

## STATE OF TENNESSEE v. JERMAINE BURDETTE

**Appeal from the Criminal Court for Shelby County**
**No. 09-04800     James M. Lammey, Jr., Judge**

---

**No. W2011-01938-CCA-R3-CD  - Filed December 26, 2012**

---

Appellant, Jermaine Burdette, pleaded guilty to three counts of especially aggravated kidnapping and three counts of aggravated robbery.  The trial court sentenced him to a total effective sentence of 111 years in the Tennessee Department of Correction.  Appellant argues that the trial court erred in sentencing him and by failing to merge the counts of especially aggravated kidnapping with aggravated robbery as to each victim.  After reviewing the record, the parties' briefs, and applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Lauren M. Fuchs and Patrick E. Swanson, Memphis, Tennessee, for the appellant, Jermaine Burdette.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Amy P. Weirich, District Attorney General; and Byron Winsett and Stacy McEndree, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Procedural History and Facts

A Shelby County grand jury indicted appellant for three counts of especially aggravated kidnapping and three counts of aggravated robbery.  Appellant filed a "Petition for Waiver of Trial by Jury and Request for Acceptance of Plea of Guilty" on April 12, 2011, the day his trial was scheduled to begin.  The trial court accepted appellant's guilty pleas to all six counts of the indictment.

A. Guilty Plea Hearing

At the April 12, 2011 guilty plea hearing, the State presented the following factual basis for appellant's pleas:

Had the matter gone to trial, the State submits the proof would have shown [that on] December 31st of 2008, Dee Warrack was starting her car in the driveway when two unknown suspects armed with handguns forced her back into her home at 1715 Graceland Cove.

Dee Warrack, Kala Jones, and [J.G.][1] were all in the house at the time. [Dee Warrack] was bound with duct tape on her hands, her feet[,] and her mouth as the two men demanded money and valuables. They went and woke up Kala Jones and took her out of the bed, asking for money and hitting her in the head a number of times with the handgun.

One of the men went into the kitchen, got out a pot of water[,] and boiled water in the kitchen while they were demanding money and ransacking the house. [J.G.], [Dee Warrack's] 14-year-old son[,] awoke and was taken into the living room as well.

They did take Kala Jones and [J.G.] back into a bedroom to get money from [J.G.], his Christmas money of $95. At that time[,] one of the men became upset that that was all the money that [J.G.] had [and] started pouring the boiling water on Kala Jones, on her back, her buttocks and her thighs.

At the time when that was going on, Dee Warrack was allowed to be alone in the living room for a time while they were ransacking the bedroom and the others were in the back room. At that point[,] Dee Warrack was able to get out of the duct tape and did leave the house, driving away in her car, getting police and bringing police back to the scene.

The two men left with cash taken from Kala Jones in the amount of about 800 or more dollars, jewelry from Kala Jones, jewelry and a cell phone from Dee Warrack and money, $95 from [J.G.].

The two men left. A witness observed one of them as they were leaving, headed toward the interstate. They pointed a gun at one of the police

---

[1] It is the policy of this court to refer to minor victims by their initials.

officers. The police officer shot, [and] the two men got away. They split up as they were leaving. Items were left inside the home. Items were left outside on a neighboring street. Those items were all recovered by police.

Inside of the home specifically was recovered the duct tape, which was processed . . . . The only prints found on it were matched to that of [appellant].

Also items included the pot, which was in the bedroom where the water had been poured on Kala Jones. No prints were recovered from the pot.

Items also included a ski mask, which was found in the living room where a lot of this had taken place. That ski mask was processed by [the Tennessee Bureau of Investigation,] and the DNA saliva sweat was matched to that of [appellant], [exceeding the] world population.

. . . [P]hoto spreads were shown to Kala Jones and Dee Warrack. They were not able to identify [appellant]. The neighbor Mr. Elvis Kelly did indicate that he would be able to identify the person. He was never shown a photo spread.

Initially anticipated was that [appellant] might put an alibi witness on the stand in trial. We did obtain a statement from her. She claimed the reason she remembered where he was, was because [Memphis Light Gas and Water ("MLGW")] had an outage that day at their apartment where he reportedly was staying. We have confirmed with MLGW[,] and they were anticipated to be rebuttal proof that there was no outage at the home on the day in question.

Those would have been the facts had the matter gone to trial. Ms. Kala Jones was taken to the hospital for multiple burns, second or third degree, . . . and did have to undergo medical treatment for quite some time.

Those would have essentially been the facts had the matter gone to trial with one exception. There was a gun also recovered at a later time[,] not found by the police at the time[,] that was [turned] over to the police. It was recovered under the couch in the living room where all of this happened[,] and it was loaded with one cocked, ready to go.

Appellant agreed that those were facts that the State would have presented at trial and asked the court to accept his guilty plea. After a full colloquy, the trial court accepted appellant's pleas of guilty to all counts of the indictment.

-3-

B. Sentencing Hearing

At appellant's sentencing hearing, Dee Dee Warrack testified that at 6:45 a.m. on December 31, 2008[2], she was preparing to leave for work. She went outside to warm up her car. When she exited her car to go back inside her home, two men wearing black ski masks approached her and told her to be quiet. They pushed her back inside of her home. Ms. Warrack said she begged the men not to hurt her because she had congestive heart failure and cardiomyopathy. The men told her to be quiet and "get down." When she obeyed, they dragged her from the doorway into the living room. The men bound her hands, feet, and mouth with duct tape. She stated that the roll of duct tape appeared to be new, and the man tore off a piece of it with his hands. One of the men covered her with a blanket.

Ms. Warrack testified that she was on the floor for approximately twenty-five minutes. One man stayed in the living room with her. The other man went back into the bedroom of Kala Jones, who also lived in the house, and awakened her. He brought Ms. Jones into the living room with Ms. Warrack.

Ms. Warrack stated that the men were trying to decide whether they would take Ms. Warrack or Ms. Jones to the back of the home. Ms. Jones told the men that she would go to the back of the home, and the men lifted her from the floor. One of the men took her to the back room. Ms. Warrack said she could hear Ms. Jones screaming and the man hitting her and asking her for money. The man who was guarding Ms. Warrack "cocked" his gun and asked Ms. Warrack where the money was located. She stated that she did not know which man it was because she was lying face-down on the floor.

Ms. Warrack testified that they brought Ms. Jones back to the front of the house. They then took Ms. Warrack to the back of the house. Her son, J.G., awakened and began walking down the hallway. The men made him lie on the living room floor. The men loosened the duct tape on Ms. Warrack's feet so that she could walk to the back of the house, but she still had duct tape on her hands and mouth. Ms. Warrack said she begged the man who was in the room with her not to do this to them. The men eventually returned Ms. Warrack to the living room.

Ms. Warrack testified that she whispered her son's name while she was on the living room floor. He did not respond, and Ms. Warrack realized she was in the living room alone. She freed herself from the tape, went outside to her car, and drove away to find the police.

_____

[2] During the hearing several witnesses and the prosecutor stated that the incident occurred on December 31, 2009. However, the July 30, 2009 indictment and the judgments indicate that the correct date of the incident is December 31, 2008.

She saw a police vehicle outside of a gas station. She said she did not want to waste time getting out of the car, so she just blew her horn and "flagged down" the officers.

Ms. Warrack stated that when she returned to her home, she was unsure whether her son would be alive, and she was prepared to bury him. She stated that one of the men received a telephone call during the incident, and she heard him discussing his child. She did not recall the men making any verbal threats toward her other than one of the men having the cocked gun to her head. She thought the men were going to kill them and imagined how the gunshot would feel. Ms. Warrack testified that each man was in control, and one was not leading the other. Both men had a gun.

Shortly after the incident, Ms. Warrack was admitted into the intensive care unit at the hospital because "[she] went home and . . . nobody [was] there." She stated that she could not stay at home alone and did not sleep well at night. She panicked if she heard noises. Ms. Warrack told the court that she was glad her family made it though the incident. She said she felt sorry for appellant's family and did not "wish this on nobody [sic] - not even [appellant]." She stated that she forgave appellant and asked the judge "to have some sympathy for him."

Kala Jones testified that she lived with Ms. Warrack. On December 31, 2008, she awakened to a man "standing in [her] face with a pistol." She stated that the man had one of her shirts over his head. The man told her to get up, go into the living room, and be quiet. She did as he instructed. When she entered the living room, she saw Ms. Warrack "on the floor duct taped up [with] a blanket over her head." A man wearing a ski mask and holding a gun was standing next to Ms. Warrack.

Ms. Jones said the men were in her home for approximately forty-five minutes. During that time, the man who was wearing the ski mask bound her with tape. The men discussed which of them would go to the back of the house with Ms. Jones. She stated that the man who had awakened her went to the back of the house with her and beat her in the head several times while asking for money. Ms. Jones lost consciousness multiple times during the beating. The man eventually brought Ms. Jones back into the living room.

Ms. Jones testified that the man who was not wearing a ski mask took Ms. Warrack to the back of the home while the man wearing the ski mask stayed in the living room with her. She stated that the man in the ski mask kicked and beat her in the head. After approximately thirty minutes, J.G. awakened and walked down the hall toward the living room. The man with the ski mask told J.G. to get on the floor. The men brought Ms. Warrack back into the living room, and one of the men was beating her. Ms. Jones told him to stop beating Ms. Warrack because Ms. Warrack did not have any more money. She told

the men that she had money and asked them to take her to where it was. The man with the ski mask told J.G. that he was going to the back of the house with them. Ms. Jones, J.G., and the man wearing the ski mask went to a bedroom in the back of the house, and the other man remained in the living room with Ms. Warrack.

Ms. Jones stated that J.G. gave the man with the ski mask his Christmas money. The man said, "That's all?," and J.G. responded, "[Y]es." The man in the ski mask then said, "B[], I'm gonna show you how we do it execution style." Ms. Jones said the man left the room and came back with a pot of boiling water. She further said,

> [H]e started taking his time pouring [the boiling water] on me with his foot in my back[,] and I had raised up and hit the pot, 'cause he had my hands duct-taped in the front. And he hit me in my head and just finished pouring the water on me.

The water hit Ms. Jones' back and side. Ms. Jones testified that after the man poured the water on her, he ran down the hallway. She and J.G. waited a moment and then ran out the front door.

Ms. Jones stated that she went to the hospital for treatment the day of the incident and was released later that evening. For two months thereafter, she had to go to the burn unit every four days to get "scrubbed and cleaned." She explained that the personnel in the burn unit scraped her old skin, cleaned it, and replaced the bandages on her wounds. She said these treatments were painful. Her wounds did not require skin grafts, but she had scars from them. Ms. Jones testified that her doctor had to prescribe sleeping medication for her because she could not sleep at night. Ms. Jones further testified that she did not think they were going to survive the incident because the man in the ski mask said they were going to "show them how they do it execution style." She stated that she thought about the incident every day, and it was something that she will never forget.

Ms. Jones testified that some time after the incident, J.G. discovered the gun that the man who was wearing the ski mask used during the incident. She explained that the man without the ski mask had a chrome gun, and the man with the ski mask had a black gun. She called the police, and they came to the home to retrieve the gun. The police told her that the gun had a bullet in the chamber.

On cross-examination, Ms. Jones testified that she never made a photograph identification of any suspect for this case. She was unable to "really see" any of the perpetrators' physical features but said the man wearing the ski mask had thick eyebrows and

-6-

was not wearing gloves. Ms. Jones admitted that she did not see the man with the ski mask drop the gun that J.G. found in their home after the incident.

J.G. testified that on the morning of December 31, 2008, he awakened and walked down the hallway of the house he lived in with Ms. Warrack and Ms. Jones. When he reached the end of the hallway, a man came from between two couches in the living room, pointed a gun in his face, and told him to get on the floor. J.G. estimated he was on the floor for twenty-five minutes. During this time, a second man was asking Ms. Jones where the money was. J.G. told the man that he had money in his room. The man picked J.G. up off the floor, and the man, J.G., and Ms. Jones went back into J.G.'s room.

J.G. stated that the second man, who was not appellant, brought a pot of hot water into his room and poured it on Ms. Jones. While the man was pouring the hot water on Ms. Jones, appellant was standing behind J.G. and eventually left the room. He said appellant never told the other man to stop pouring the water on Ms. Jones. J.G. testified that it appeared that both men were in control.

J.G. testified that during the incident, he was "hoping [his] family was okay, and [he] hoped [they'd] get out of this alive." He stated that as a result of the incident, he could not sleep regularly because he would get paranoid if he heard "a bump on the wall." He said his life was not the same anymore.

Officer Robert Winston, a latent fingerprint examiner with the Memphis Police Department, testified that he examined the latent prints on a piece of duct tape that investigators found. He developed a "latent print of value" from the piece of duct tape that was marked as being from Ms. Warrack's mouth. Using the print, he conducted an automated fingerprint identification search and made a positive identification of appellant. He also did a manual comparison and determined that the fingerprints came from appellant. He stated that the print contained at least sixteen points of identity. On cross-examination, Officer Winston testified that when he conducted the automated search he requested twenty-five candidates, which was the standard established by his office.

Officer Glen Teal with the Memphis Police Department testified that on December 31, 2008, Ms. Warrack "flagged down" him and his partner while they were at a gas station. She told them that some men had entered her house and held her and the other victims hostage. She was able to escape. Officer Teal said Ms. Warrack was nervous, panicky, and anxious when she approached him.

Officer Teal and his partner entered their police vehicle and radioed for additional officers to go to the house. He stated that officers established a perimeter around Ms.

Warrack's house. Officer Teal went to the side door of the house, and his partner went to the front door. He initially did not see anything; however, appellant eventually appeared at the side door with a gun in his hand. Appellant pointed his gun at Officer Teal. Officer Teal shot at appellant but missed. Appellant ran back inside the house after Officer Teal shot at him again. Officer Teal did not chase appellant or see him again that morning. Officer Teal stated he felt threatened for his life when appellant pointed the gun at him.

On cross-examination, Officer Teal testified that appellant was not wearing a ski mask, but he could barely see his face. He said the person might have had something around his neck. He stated that the gun the person had was a silver semi-automatic gun. He did not review any photograph lineups to identify the person he saw at the side door. He gave a description of the person he saw at the door, but the description was not included in the police report.

Appellant testified at the sentencing hearing. He stated that he did not have a high school diploma or "GED." He completed the tenth grade and began GED classes in the eleventh grade, but he did not complete them. He stated that he was in the process of researching how to obtain his GED when he was arrested. After leaving high school, appellant had a steady work history, only being unemployed for approximately four months during the nine years between then and the incident. Appellant said he did not have any convictions for violent offenses but admitted he had convictions for traffic offenses and "drug paraphernalia." He had a juvenile adjudication for aggravated assault for firing a gun into the ground during an altercation when he was sixteen years old. Appellant denied being affiliated with any gangs or having a history of being violent.

While in jail, appellant obtained drug and alcohol and anger management certificates. He stated that he learned how to control his anger and think before he spoke and reacted in his anger management class. In his drug and alcohol class, he learned to change the way he thought. He said he did not have a problem with alcohol, but he smoked marijuana "probably like once every two days." Appellant also attended a life skills class where he learned how to establish a bank account, complete job applications, and create a resume. Appellant felt he could successfully assimilate himself into society when released from incarceration.

Appellant testified that his parents frequently engaged in physical altercations when he was young. He stated that he had two children with whom he lived and supported. He stated that if he were released, he would get his life "back on track," get a job, and "start back being the backbone of [his] family and [his] household." He said that he was close to his family and that his family supported him.

Appellant stated that he entered an *Alford*[3] or "best interest" plea to the charges. He stated that the plea was in his best interest "instead of taking a chance on [his] life . . . [he] would rather take a plea to just . . . not say[] [he] did anything but just for [his] best interest as far as getting back home to [his] family." Appellant was aware of the evidence in the case, including fingerprints and DNA that authorities matched to him. He realized that he could possibly receive a "very heavy sentence" if he proceeded to trial. Appellant said he had maintained that he was not involved in the incident since the beginning of his case. He said he did not know who was involved, and he would tell the court if he knew.

Appellant told the victims that he was sorry the incident happened to them and that if he could turn back time for them, he would. He denied any involvement in the incident and said he would never put anyone in that type of situation. He told the court that he was "willing to do whatever it takes to . . . prove to [the court] that [he is] not that type of person that they are portraying [him] to be."

On cross-examination, appellant testified that his mother apologized to the victims for what he did because "she felt the same way that [Ms. Warrack] felt [toward his] family." When asked why his mother specifically apologized for what he did and not just for what had happened to the victim, appellant said he could not speak for his mother. Appellant also said he could not speak for his mother when asked why she repeatedly begged him to disclose who the second person was. Appellant told his mother that he was not involved in the incident. He stated she knew he was not involved because he was "not that type of person."

Appellant denied that the arrest ticket for his prior aggravated assault juvenile adjudication stated that he and two friends went to the victim's house and fired shots at him. The juvenile court transferred appellant's aggravated assault case to the criminal court for prosecution for unlawful possession of a weapon. Appellant admitted that his mother also filed charges against him for being unruly and disobedient, and appellant pleaded guilty to those charges. Appellant further admitted that he had been in and out of jail for misdemeanor offenses. At the time of the incident in this case, appellant was released on bond for charges of possession of marijuana and driving on a suspended license. Appellant admitted that he was laid off approximately a month and a half before the incident. However, he said he did not need money because he had saved money while working, and he was expecting an income tax refund.

Appellant testified that he apologized to the victims because it could have been his family in that situation. He said he had a conscience and a heart. The prosecutor pointed out that appellant's fingerprints were on the duct tape found at the scene and that a ski mask with

---

[3] *See North Carolina v. Alford*, 400 U.S. 25, 37 (1970).

his DNA was found at the scene. However, appellant continued to deny his involvement. He stated that Officer Teal did not see him at the door of Ms. Warrack's house because he was never there.

On redirect examination, appellant stated that he thought a minimal sentence would be fair so he could continue his life, learn a skill, and be a positive example for his children.

Caroline Burdette, appellant's mother, testified that during appellant's early years they lived with her husband, appellant's father. Ms. Burdette said her relationship with appellant's father was abusive, but she remained in it because she wanted appellant to have a father in his life. She further said appellant's father was an alcoholic. She left her husband when appellant was young so she could raise appellant in a better environment. Ms. Burdette eventually remarried. She stated that her relationship with her second husband started great; however, after they were married it became abusive because her husband abused drugs. She said her children witnessed her being abused by her husbands.

Ms. Burdette described appellant as "very compassionate" and an animal lover when he was young. She stated that he was respectful, and she taught him that no matter what they went through, he had to be the best that he could be. She testified that when appellant was a teenager, she called the police a couple of times because appellant did not come from school like she had asked. She said she wanted to show appellant what would happen if he got into trouble. Ms. Burdette admitted that appellant got into "trouble here and there" for "little fights - what children usually do." However, she stated that he was a "good boy."

Ms. Burdette testified that she was aware appellant was charged with and pleaded guilty to aggravated assault in the juvenile court. She said she did not raise appellant to commit aggravated assault. She and appellant lived in a low-income area that had "a lot of stuff going on," but she kept appellant at home and was strict. Ms. Burdette stated that she sheltered appellant because he did not have a father in his life.

Ms. Burdette testified that appellant knew the victim's family. She said a woman named "Ms. Mildred" was like a godmother to appellant, and Ms. Mildred is related to the victims. However, according to Ms. Burdette, appellant did not know the victims. Ms. Burdette testified that she apologized to the victims "out of respect." She stated that the incident could have happened to her or her children. When apologizing, Ms. Burdette told Ms. Jones, "I don't know what happened, but whatever happened, if it was my son, . . . he would deserve to be where he is; but if it wasn't, I wouldn't want to see him go through nothin' that he didn't do." She said she apologized to the victims for what they had gone through out of sympathy, and her apology was not an admission of appellant's guilt.

-10-

On cross-examination, Ms. Burdette admitted to telling Ms. Jones that she pleaded with appellant to disclose the second person who was with him. She explained that she told appellant to be honest if he had something to do with the incident. She reiterated that she did not know if appellant was involved, but if he was, she encouraged him "to do the right thing."

After hearing the evidence, the trial court found that appellant was a Range I standard offender. The court further found that the following enhancement factors were applicable to appellant's sentence: appellant "has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range"; appellant was a leader in the commission of an offense involving two or more criminal actors; the offense involved more than one victim; appellant "treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense"; "[t]he personal injuries inflicted upon, or the amount of damage to property sustained by or taken from, the victim was particularly great"; appellant was on probation at the time the felony was committed; and appellant "was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult[.]" Tenn. Code Ann. § 40-35-114(1), (2), (3), (5), (6), (13), (16) (2006). The court did not apply any mitigating factors. The trial court sentenced appellant to serve twenty-five years for each especially aggravated kidnapping conviction and twelve years for each aggravated robbery conviction. The trial court found that appellant was a dangerous offender whose behavior indicated little or no regard for human life and that appellant had no hesitation about committing a crime in which the risk to human life was high. *See* Tenn. Code Ann. § 40-35-115(b)(4) (2006). The court further found that circumstances surrounding the commission of the offense were aggravated and that the aggregate length of the sentences reasonably related to the offenses for which appellant stood convicted. The trial court ordered that appellant serve his sentences consecutively to each other for a total effective sentence of 111 years.

## II. Analysis

### A. Sentencing

Appellant challenges the trial court's sentencing him to the maximum sentences within his range based on the court's finding of several enhancement factors. Appellant also argues that the trial court erred by imposing consecutive sentences.

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence

and information offered by the parties on mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -113, -114, -210(b) (2010). In addition, "[t]he sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(4) (2010).

When imposing a sentence within the appropriate range of punishment for a defendant,

> the court shall consider, but is not bound by, the following advisory sentencing guidelines:
>
> (1)     The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> (2)     The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2010). From these principles, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008) (quoting Tenn. Code Ann. § 40-35-210(d)).

Pursuant to the 2005 amendments, the Sentencing Act abandoned the statutory minimum sentence and rendered enhancement factors advisory only. *See* Tenn. Code Ann. §§ 40-35-114, 40-35-210(c) (2010). The 2005 amendments set forth certain "advisory sentencing guidelines" that are not binding on the trial court; however, the trial court must nonetheless consider them. *See id*. § 40-35-210(c). Although the application of the factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors in §§ 40-35-113 and 40-35-114." *Id*. § 40-35-210(b)(5). The trial court must also place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing." *Id*. § 40-35-210(e). The weighing of mitigating and enhancing factors is left to the sound discretion of the trial court. *Carter*, 254 S.W.3d at 345. The burden of proving applicable mitigating factors rests upon appellant. *State v. Mark Moore*, No.

03C01-9403-CR-00098, 1995 WL 548786, at *6 (Tenn. Crim. App. Sept. 18, 1995). The trial court's weighing of the various enhancement and mitigating factors is not grounds for reversal under the revised Sentencing Act. *Carter*, 254 S.W.3d at 345 (citing *State v. Devin Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App. July 6, 2007), *aff'd as corrected*, 271 S.W.3d 90 (Tenn. 2008)).

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, ___ S.W.3d ___, No. E2011-00005-SC-R11-CD, 2012 WL 4380564, at *17 (Tenn. Sept. 26, 2012). If a trial court misapplies an enhancing or mitigating factor in passing sentence, said error will not remove the presumption of reasonableness from its sentencing determination. *Id.* at 17. This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See Carter*, 254 S.W.3d at 346. The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2010), Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

## 1. Enhancement Factors

Appellant claims that the trial court should have given little weight to enhancement factors (1), (6), (13), and (16). We note that the 2005 amendments to the Sentencing Act rendered the enhancement and mitigating factors merely advisory and removed the trial court's weighing of enhancement and mitigating as an issue subject to appellate review. *See Carter*, 254 S.W.3d at 345 (citing *Devin Banks*, 2007 WL 1966039, at *48). Thus appellant's challenges to the weight the trial court assigned these enhancement factors are without merit.

Appellant further argues that the trial court's finding enhancement factor (2) that he was the leader of an offense involving two or more criminal actors was contrary to the evidence presented at the sentencing hearing. We disagree. At the sentencing hearing, all three victims testified that appellant and his accomplice shared control of the situation. "Both of two criminal actors may be 'a leader in the commission of an offense.'" *State v. Hicks*, 868 S.W.2d 729, 731 (Tenn. Crim. App. 1993) (quoting *State v. Brenda Harris*, No. 01C01-9101-CR-00247, 1991 WL 186850, at *14 (Tenn. Crim. App. Sept. 24, 1991). "Our cases have established that enhancement for being a leader in the commission of an offense does not require that the defendant be the sole leader but only that he be 'a' leader." *Id.* (citing *State v. James Teague*, No. 03CO1-9102-CR-00060, 1992 WL 28468, at *2 (Tenn.

Crim. App. Feb. 19, 1992)). Thus, the trial court did not abuse its discretion in applying this enhancement factor.

Next, appellant contests the trial court's application of enhancement factor (3), that the offense involved more than one victim, based on appellant's shooting at Officer Teal. The State concedes that the trial court misapplied this enhancement factor. The trial court relied on Officer Teal's testimony that appellant pointed a gun at him when applying this enhancement factor. However, the State indicted appellant for and appellant stands convicted of committing the offenses against three specific, named victims. The language in enhancement factor (3) limits its application to offenses that involve "more than one (1) victim." *State v. Imfeld*, 70 S.W.3d 698, 706 (Tenn. 2002) (quoting Tenn. Code. Ann. § 40-35-114(3) (1997 & Supp. 2001)). "In short, there cannot be multiple victims for any one offense . . . committed against a specific, named victim." *Id.* Thus, the trial court erred in applying this enhancement factor.

Finally, appellant posits that the trial court applied enhancement factors (5), that appellant treated, or allowed a victim to be treated with, exceptional cruelty, and (6), that a victim suffered particularly great personal injuries, in error. Appellant asserts that the facts upon which the trial court relied in finding exceptional cruelty and the fact that the victim suffered great personal injury are the facts that made the crimes aggravated and especially aggravated. The State responds that the evidence supports the trial courts application of these factors. We agree with the State.

The trial court applied enhancement factors (5) and (6) to the convictions where Ms. Jones was the victim based on the boiling water being poured on her and the resulting injuries. When applying the exceptional cruelty enhancement factor, proper application of this factor requires a court to find cruelty that is over and above what is required to sustain a conviction for the offense. *State v. Arnett*, 49 S.W.3d 250, 258 (Tenn. 2001) (citing *State v. Embry*, 915 S.W.2d 451, 456 (Tenn. Crim. App. 1995), *overruled on other grounds by State v. Winfield*, 23 S.W.3d 279, 283 n.5 (Tenn. 2000)). The trial court found that appellant and his accomplice could have forced Ms. Jones into the room at gunpoint and made her stay in it without resorting to pouring boiling water on her. Thus, pouring the boiling water on her was over and above what was required to sustain a conviction for aggravated robbery and especially aggravated kidnapping. Further, the trial court found that the victim was severely scarred by the boiling water. In addition, the evidence showed that because of her injuries, she had to undergo painful treatment every four days for two months. Appellant also contends that these enhancement factors were applied in error because the evidence suggested his accomplice was the one who poured the boiling water on Ms. Jones. However, as the trial court noted, although only one man actually poured the water, both were involved in the process of the boiling water being poured on Ms. Jones. Appellant stood guard over

-14-

Ms. Jones and J.G. so his accomplice could retrieve the boiling water. Further, appellant did nothing to prevent his accomplice from pouring the boiling water on Ms. Jones. *See State v. Robert L. Adams*, No. M2010-00916-CCA-R3-CD, 2011 WL 5553485, at * 15 (Tenn. Crim. App. Nov. 8, 2011) (rejecting appellant's argument that he was a "passive participant" and holding that the trial court properly applied the "exceptional cruelty" enhancement factor when appellant continued to allow his accomplice to shoot the victim after she had fallen to the ground). Thus, even if he was not the man who physically poured the water on Ms. Jones, he and his accomplice were equally responsible for the boiling water being poured on her. Accordingly, we conclude that the trial court did not commit error in applying these enhancement factors.

## 2. Mitigating Factors

Appellant further contends that the trial court compounded the erroneous application of enhancement factors by failing to consider mitigating factors. Appellant claims that the trial court ignored his testimony that he was sorry for what the victims had to endure, failed to place any "real significance" on the fact that appellant was not affiliated with a gang, and gave no consideration to the fact that he was attempting to better himself while incarcerated, had a troubled childhood, and chose to plead guilty "rather than taking up the court's time and the taxpayer's money." We disagree.

When sentencing appellant, the trial court reviewed each statutory mitigating factor and the mitigation evidence offered by appellant and made a determination of whether they applied. The trial court did not ignore appellant's testimony regarding his remorse. The trial court considered appellant's statements of remorse and chose not to accredit his testimony. The court found that appellant showed a "total lack of remorse" and blamed what happened and his problems on others. Although appellant said he was sorry for what happened to the victims, he continued to deny his involvement despite the DNA and fingerprint evidence against him. The trial court also noted that appellant refused to name his accomplice. The trial court considered appellant's lack of gang affiliation and troubled childhood but chose to assign minor weight to these factors. The evidence does not support the application of the mitigating factors submitted by appellant. Further, appellant may not appeal the weight given to mitigating factors by the trial court. *See Carter*, 254 S.W.3d at 345 (citing *Devin Banks*, 2007 WL 1966039, at *48). Accordingly, we conclude that the trial court did not err in declining to apply certain mitigating factors and giving very little weight to other mitigating factors.

While the trial court may have misapplied enhancement factor (3), appellant's sentence fell within the appropriate range, and the record shows that the trial court sentenced

appellant according to the statutory purposes and principles of sentencing. Thus, we conclude that appellant is not entitled to relief on this issue.

### 3. Consecutive Sentencing

Appellant asserts that the trial court erred in ordering that he serve his sentences consecutively to each other. He contends that the trial court's using his pouring boiling water on Ms. Jones to support his being a dangerous offender was erroneous because the evidence showed he did not pour the water. He further states that the aggregate sentence he received was not reasonably related to the severity of the offenses.

In determining whether to order appellant to serve his sentences concurrently or consecutively, the trial court found that appellant "is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4) (2010). "[W]hen a trial court uses the 'dangerous offender' factor, it must also decide whether consecutive sentences (1) reasonably relate to the severity of the offenses committed; (2) serve to protect the public from further criminal conduct by the offender; and (3) are congruent with general principles of sentencing." *State v. Alder*, 71 S.W.3d 299, 307 (Tenn. Crim. App. 2001) (quoting *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995)).

Here, the trial court based its findings concerning consecutive sentencing on appellant's pouring boiling water on Ms. Jones and the experience that appellant and his accomplice put the victims through. The trial court stated that the circumstances surrounding the commission of the offenses were not only aggravated; they were egregious. Thus, the court found that the aggregate length of the sentences reasonably related to the offenses for which appellant stands convicted. The trial court further found that consecutive sentences served to protect the public from further criminal conduct by the offender because " someone with [appellant's] mentality[,] . . . lack of feeling[,] and this amount of cruelty within [himself] should [not] be walking around the streets of Memphis/Shelby County anytime soon."

The record shows that appellant, while possessing a gun, participated in a robbery during which a victim was bound with duct tape, multiple victims were beaten, and a victim had a pot of boiling water poured on her. The victims included Ms. Warrack, who advised appellant and his accomplice that she had health problems, and J.G., a minor. The other victim, Ms. Jones, was seriously injured and scarred from having the boiling water poured on her. The victims no longer feel safe in their home and cannot sleep at night. Appellant refuses to take responsibility for his actions and continues to deny his involvement despite the substantial evidence against him. Thus, we agree with the trial court's findings that

appellant "is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high," the aggregate length of the sentences reasonably related to the offenses for which appellant stands convicted, and extended confinement is necessary to protect the public from appellant's further criminal conduct. Appellant is not entitled to relief on this issue.

## B. Double Jeopardy

Finally, appellant contends that dual convictions for aggravated robbery and especially aggravated kidnapping violate double jeopardy because, under the facts of this case, the confinement of the victim was limited to that necessary to perpetrate the offense of aggravated robbery, and thus does not support an independent conviction for especially aggravated kidnapping. The State responds that by virtue of our supreme court's ruling in *State v. White*, 362 S.W.3d 559 (Tenn. 2012), a due process analysis, not a double jeopardy analysis, is the appropriate test for challenges concerning dual convictions for kidnapping and another offense. The State further asserts that "by pleading guilty to the charged offenses, [appellant] agreed that the evidence was sufficient to support his convictions and waived appellate review of the evidence."

Proof of especially aggravated kidnapping must necessarily establish that, among other factors, the offender "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. §§ 39-13-303, -305 (2010). The offense of especially aggravated robbery is completed when an offender intentionally or knowingly commits theft of property from another person by violence or by fear and does so with a deadly weapon, causing the victim to suffer serious bodily injury. Tenn. Code Ann. §§ 39-13-401, -403 (2010). Appellant argues that the confinement of the victims was limited to that necessary to perpetrate the offense of aggravated robbery.

In *White*, the Tennessee Supreme Court overruled *"the entire line of cases including a separate due process analysis in appellate review." White*, 362 S.W.3d at 578. The court addressed the application of the due process test to convictions for kidnapping and an accompanying felony. The court held:

[T]he legislature did not intend for the kidnapping statutes to apply to the removal or confinement of a victim that is essentially incidental to an accompanying felony, such as rape or robbery. This inquiry, however, is a question for the jury after appropriate instructions, which appellate courts review under the sufficiency of the evidence standard as the due process safeguard.

-17-

*Id.* at 562. The court concluded that our kidnapping offenses "evince a legislative intent to punish as kidnapping only those instances in which the removal or confinement has criminal significance above and beyond that necessary to consummate some underlying offense, such as robbery or rape." *Id.* at 577. The supreme court in *White* held that "trial courts must ensure that juries return kidnapping convictions only in those instances in which the victim's removal or confinement exceeds that which is necessary to accomplish the accompanying felony." *Id.* at 578. The supreme court concluded that the "the determination of whether the removal or confinement of [the victim] constituted a substantial interference with [his or her] liberty was a question of fact for the jury." *Id.* at 579. According to the supreme court, a jury instruction requiring a "determination of whether the removal or confinement is, in essence, incidental to the accompanying felony or, in the alternative, is significant enough, standing alone, to support a conviction" is needed to ensure constitutional due process is given to defendants charged with kidnapping and an accompanying felony. *Id.* at 578. The standard articulated in *White* "requires the jury to ascertain, in the first instance, whether the movement or confinement of the victim was 'essentially incidental' to that which is part of an accompanying offense." *Id.* Essentially, the court's holding in *White* mandates that a jury determine the sufficiency of the evidence supporting dual convictions for a kidnapping offense and another offense.

At his guilty plea hearing, appellant agreed that the stipulated evidence was sufficient to support his convictions. Appellant pleaded guilty to the charges, and nothing in the record indicates he entered his guilty pleas unknowingly or involuntarily. By pleading guilty, appellant waived his right to have a jury determine whether the evidence was sufficient to support his convictions. *See Hobbs v. State*, 73 S.W.3d 155, 158-59 (Tenn. Crim. App. 2001) ("Absent some proof in the record that [appellant's] guilty plea was not knowingly and voluntarily entered, the only conclusion to be reached is that he waived any challenge to the sufficiency of the evidence upon entry of the guilty plea."). "The principle is well-settled in Tennessee jurisprudence that the voluntary entry of an informed and counseled guilty plea constitutes an admission of all facts necessary to convict and waives all non-jurisdictional defects and constitutional irregularities which may have existed prior to the entry of the guilty plea." *State v. Pettus*, 986 S.W.2d 540, 542 (Tenn. 1999). Accordingly, we conclude that appellant has waived this issue and is not entitled to relief.

## CONCLUSION

After careful review of the parties' briefs and the entire record, we find no error and affirm the judgments of the trial court.

_____

ROGER A. PAGE, JUDGE

-18-