IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 25, 2020 Session

## MICAH ROSS JOHNSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 10700      G. Scott Green, Judge**

_____

### No. E2019-00491-CCA-R3-PC

_____

The Petitioner, Micah Ross Johnson, challenges the denial of his petition for post-conviction relief, wherein he attacked his jury convictions for first degree murder and especially aggravated robbery. On appeal, the Petitioner raises numerous grounds of ineffective assistance of counsel; in addition, he raises an allegation of cumulative error based upon counsel's ineffectiveness. Having reviewed the entire record and the briefs of the parties, we are constrained to agree with the Petitioner that the post-conviction court failed to make sufficient findings of fact and conclusions of law to enable appellate review of all his claims. Accordingly, we reverse the judgment of the post-conviction court and remand this case for proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed;**
**Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JJ., joined.

Gregory P. Isaacs and J. Franklin Ammons, Knoxville, Tennessee, for the appellant, Micah Ross Johnson.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Charme P. Allen, District Attorney General; and Kevin J. Allen, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

This case arises from the brutal beating, slashing, and strangulation of twenty-four-year-old Carrie Daughtery ("the victim"), which occurred during the early morning hours of March 19, 2008, in the front yard of her North Knoxville residence—a residence which

she shared with the Petitioner's then girlfriend. Thereafter, a Knox County grand jury returned a six-count indictment against the Petitioner, charging him with one count of first-degree premeditated murder; two counts of first-degree felony murder (during the perpetration of a robbery or a kidnapping, alternatively); two counts of especially aggravated kidnapping (resulting in serious bodily injury or being accomplished with a deadly weapon, alternatively); and one count of especially aggravated robbery. See Tenn. Code Ann. §§ 39-13-202, -305, -403. For a detailed recitation of the facts underlying those offenses, refer to State v. Micah Johnson, E2013-02356-CCA-R3-CD, 2015 WL 913657 (Tenn. Crim. App. Mar. 2, 2015), perm. app. denied (Tenn. June 11, 2015) (designated not for citation[1]).

1. Trial. A ten-day trial took place in November 2011. At trial, the Petitioner presented an insanity defense, and multiple witnesses were called on his behalf. Johnson, 2015 WL 913657, at *5.

The Petitioner called both of his parents to testify, and they provided details of the Petitioner's mental health history since childhood. Johnson, 2015 WL 913657, at *5-7. His father testified that due to behavioral concerns prior to the victim's murder, the Petitioner had been hospitalized for mental illness; that at the time of admission, the Petitioner had received a diagnosis of "psychotic disorder, not otherwise specified"; that upon discharge, the Petitioner's doctor indicated that it was necessary to "rule out bipolar mania with psychosis versus first onset of schizophrenia"; and that the Petitioner had been prescribed anti-psychotic medications during his hospital stay. In the Petitioner's father's opinion, his son suffered from schizophrenia. The Petitioner's mother also testified about the Petitioner's mental state, providing similar testimony as the Petitioner's father.

The parties agreed to stipulate to a journal entry written by the victim. Johnson, 2015 WL 913657, at *7. In the entry, the victim compared the Petitioner to a schizophrenic relative, and she indicated that the Petitioner "terrifie[d]" her. Id.

Next, the Petitioner presented Dr. Andrew Demick, a clinical psychologist, who evaluated the Petitioner's mental state after the Petitioner, a college student, assaulted another classmate in September 2007. Johnson, 2015 WL 913657, at *7. Dr. Demick concluded that at the time of the assault, the Petitioner was suffering from a "severe mental disease or defect" that prevented him "from appreciating the nature or wrongfulness of such acts." Id. Dr. Demick further determined that there was "strong reason to believe

---

[1] We acknowledge that the opinion from this court on direct appeal has been designated as not for citation by our supreme court. Citation to this court's opinion is solely for historical and procedural context, and we place no reliance on the reasoning or rationale contained therein.

that [the Petitioner] only engaged in his violent behavior due primarily to psychosis he was experiencing in September of 2007." Id.

Dr. Keith Allen Caruso testified as an expert psychiatric witness. Johnson, 2015 WL 913657, at *8. Dr. Caruso testified that he reviewed many of the discovery materials, including police reports and other information gathered by law enforcement about the murder and the prior assault, medical records, school records, and crime scene and autopsy photographs, and he ultimately diagnosed the Petitioner as suffering from a "schizoaffective disorder, bipolar type." Id. In Dr. Caruso's opinion, the Petitioner "was unable to appreciate the nature and wrongfulness of his actions" when he attacked and killed the victim. Id. According to Dr. Caruso, the Petitioner committed these offenses during a period of "paranoid psychosis[.]" Id.

Dr. Caruso acknowledged that in making this diagnosis, he had obtained several different versions of the events surrounding the murder from the Petitioner. Johnson, 2015 WL 913657, at *8. According to Dr. Caruso, those different versions included one where the victim owed the Petitioner money for marijuana, one where the Petitioner mistook the victim for his girlfriend's ex-boyfriend, and one where the Petitioner only identified the victim as a "scary black figure" or "shape" that was coming towards him and wanted to kill him. Id. Dr. Caruso also opined that the Petitioner's mental state had deteriorated since their initial encounter.

Trial counsel asked Dr. Caruso what his recommendation for the Petitioner's future was "in terms of psychiatric care and what kind of psychiatric hospitalization" would be needed. Johnson, 2015 WL 913657, at *28. Dr. Caruso responded that if the Petitioner was found to be insane, "he should be hospitalized in a forensic psychiatric hospital indefinitely" and was "going to need lifelong medication" to be given by monthly injections. Id. Dr. Caruso continued,

> You know, this is a guy who is not real forthcoming about how mentally ill he is. He's going to need to be monitored very, very closely. You know, I think those are the things that, you know, are the best options. . . .
>
> You know, if he winds up in prison he's going to need the same kind of treatment. The access to it is not going to be as good. I kind of worry about medication noncompliance 'cause I've already seen a case where a corrections officer was murdered by . . . an inmate . . . with psychiatric illness that was not on mediation.

Id.

On cross-examination, over the objection of the defense, the State was allowed to impeach Dr. Caruso with a twenty-two-year-old academic misdeed. Specifically, Dr. Caruso admitted that twenty-two years ago, while at Cornell University, he altered some data on a "med student research project." Johnson, 2015 WL 913657, at *22. On redirect, Dr. Caruso explained to the jury that he had "never published any of the data" and that the incident had not caused him any problems in his career. Id.

Finally, neuropsychologist Dr. Daniel Spica administered several psychological tests to the Petitioner. Johnson, 2015 WL 913657, at *8. Dr. Spica relayed his findings from those tests to the jury, most importantly that the Petitioner was not aggressive or assertive and would likely only be violent during a state of psychosis.

In rebuttal, the State presented evidence of the Petitioner's disciplinary records while in prison awaiting trial, which reflected several violations of prison rules; evidence that the Petitioner went to the prison's law library nineteen times during his detention; and evidence of the Petitioner's bank records, which showed his activity around the time of the murder, including a $500 cash withdrawal. Johnson, 2015 WL 913657, at *9. The State also presented testimony from the Petitioner's warehouse supervisor at Coca-Cola that the Petitioner was a good worker and exhibited no signs of mental illness. Id. The supervisor also testified that when the Petitioner's shift ended early on the morning of the murder, the Petitioner asked another employee to borrow that employee's car, though the employee refused, and that the Petitioner appeared neither upset nor agitated when he left the warehouse.

The Petitioner's former girlfriend was recalled as a witness. Johnson, 2015 WL 913657, at *9. She reiterated that the Petitioner sounded normal when she spoke with him on the morning of the murder.

The State then presented testimony from its own psychiatric expert, Dr. Rokeya Srutana Farooque, who had performed a forensic evaluation of the Petitioner while he was receiving inpatient care at her facility, a maximum security psychiatric facility. Johnson, 2015 WL 913657, at *9. Dr. Farooque opined that the Petitioner was able to appreciate the nature and the wrongfulness of his acts. Dr. Farooque further stated that "[m]ental illness is one part" of the equation in making insanity determinations, it does not by itself make someone unable to appreciate the wrongfulness or nature of their conduct. Id.

In addition, Dr. Farooque indicated that the Petitioner had provided her with "many different accounts" before telling her that "[h]e didn't know where he was, and he felt like something came after him, and he was just striking back." Johnson, 2015 WL 913657, at *9. Also, the State asked Dr. Farooque if she had ever manipulated any data during her medical career, and she said that she had never altered or fabricated data "in [her] life." Id. at *22.

- 4 -

Finally, when Dr. Farooque was asked her opinion about "whether or not [the Petitioner] was committable," she replied that she had not been asked by the court to make that determination but that she believed the Petitioner was "competent to stand trial, not committable." Johnson, 2015 WL 913657, at *28 (footnote omitted). When asked who would be the doctor to determine whether or not the Petitioner was committable, Dr. Farooque replied,

> What happens, that when . . . the court declares anybody not guilty by reason of insanity, the person doesn't have anymore charge. So the person is ready to go to the community, go back to the community, have to be released to the community.
>
> So at that point the court should right away call two mental health professionals to do that, to determine the committability. And if they determine that patient is committable, then [the] patient gets into the hospital. If they determine that [the] patient is not committable, then [the] patient gets released into the community.

Id. at *28-29.

Following the conclusion of proof, the jury found the Petitioner guilty as charged and rejected his insanity defense. The three murder convictions were merged into a single count, and the two especially aggravated kidnapping convictions were likewise merged into a single count. The trial court sentenced the Petitioner to life for the murder convictions and to twenty-five years each for the kidnapping and robbery convictions, which resulted in an effective sentence of life plus fifty years.

2. Direct Appeal. The Petitioner appealed his convictions and sentence to this court. On appeal, the Petitioner argued (1) the evidence was insufficient to support his conviction for premeditated murder; (2) the trial court erred by failing to instruct the jury regarding substantial interference as mandated in State v. White, 362 S.W.3d 559 (Tenn. 2012), thus, requiring reversal of his kidnapping convictions; (3) the trial court erred, in violation of Tennessee Rule of Evidence 404(b), by allowing introduction of the Petitioner's prison disciplinary records as rebuttal evidence to Dr. Spica's testimony about the Petitioner's psychological test results; (4) the trial court abused its discretion by allowing the State to impeach Dr. Caruso with his twenty-two-year-old academic misdeed; (5) the trial court erred by failing to suppress the video recording of the crime scene and the photographs taken at the crime scene and during the victim's autopsy, all gruesomely depicting the victim's body; (6) plain error occurred when the State elicited testimony from Dr. Farooque that if the Petitioner were found not guilty by reason of insanity, he was not committable to a mental health facility in her opinion; and (7) the imposition of consecutive sentencing was improper. Johnson, 2015 WL 913657, at *1. This court reversed and remanded the

especially aggravated kidnapping convictions for a new trial based on the trial court's failure to give appropriate jury instructions,[2] but affirmed the judgments of the trial court in all other respects.  Id.

Specifically, relative to the issues presented by the Petitioner in this post-conviction proceeding, this court held that "the probative value of [Dr. Caruso's] twenty-two-year-old academic misdeed substantially outweighed its unfair prejudicial effect upon the jury, and inquiry into such conduct was proper cross-examination under Rule 608(b)."  Johnson, 2015 WL 913657, at *23.  Moreover, this court found that plain error relief was unwarranted by Dr. Farooque's testimony regarding what was required to commit a similarly-situated defendant following an acquittal and by her opinion that the Petitioner was not committable.  Id. at *32.  Noting that the defense had opened the door to such testimony during its direct examination of Dr. Caruso, this court reasoned that trial counsel's failure to object was possibly tactical and that consideration of the alleged error was not necessary to do substantial justice.  Id.  Our supreme court denied permission to appeal on June 11, 2015, though it designated this court's opinion not for citation.

The Petitioner's pro se petition for post-conviction relief was filed on December 14, 2015, and following the appointment of counsel, an amended petition was filed.  In the amended petition, the Petitioner raised multiple allegations of ineffective assistance of counsel: (1) "trial counsel[3] [were] ineffective in selecting, preparing, [and] presenting expert witness testimony regarding [the Petitioner's] mental health and insanity defense"; (2) "[l]ead counsel failed [to] advise [the Petitioner] concerning the Board of Professional Responsibility['s] inquiry into the [p]rosecutor and move for disqualification"; (3) "[l]ead counsel created an actual conflict of interest by supporting the [p]rosecutor during the Board of Professional Responsibility['s] inquiry and failing to advise [the Petitioner] of the conflict"; (4) "trial counsel failed to lodge a contemporaneous objection when [Dr. Farooque] testified that [the Petitioner] would not be confined"; (5) "[t]rial counsel failed to advise [the] Petitioner of the trial [j]udge's conflict of interest"; and (6) "[e]ven if [trial [c]ounsel's errors do not individually amount to ineffective assistance of counsel, cumulatively, the aforementioned errors warrant relief."

3. Post-Conviction Proceedings.  A post-conviction hearing was held on October 3, 2018, at which both lead counsel and co-counsel testified.  They testified about matters covering the selection of Dr. Caruso as their defense expert, their preparation for and presentation of Dr. Caruso's testimony at trial, the Board of Professional Responsibility's

---

[2] No further disposition of the Petitioner's especially aggravated kidnapping charges is apparent from the record.

[3] For the purpose of clarity, we will refer to the Petitioner's trial attorneys collectively as "trial counsel" and individually as "lead counsel" or "co-counsel."

inquiry into the prosecutor in this case for a <u>Brady</u> violation, the failure to object to Dr. Farooque's testimony suggesting that the Petitioner would be released if he were found not guilty by reason of insanity, and the trial court's alleged conflict of interest.

Relative to the selection of Dr. Caruso as an expert, lead counsel testified that he had used Dr. Caruso in six other cases prior to the Petitioner's, that he knew of several other defense attorneys who had used Dr. Caruso, that Dr. Caruso had impressive qualifications, that Dr. Caruso was on the Administrative Office of the Court's list of approved psychiatrists, that he had talked to the Federal Public Defender's Office and Post-Conviction Defender's Office about Dr. Caruso, and that the Post-Conviction Defender's Office had recommended Dr. Caruso. In addition to meetings with lead counsel, co-counsel also met with Dr. Caruso in preparation for trial, and co-counsel believed him to be a credible witness. Nonetheless, lead counsel and co-counsel were both unaware of Dr. Caruso's academic impropriety until sometime during the Petitioner's trial.

Relative to their preparation for and presentation of Dr. Caruso's testimony at trial, lead counsel testified that after the State indicated its intention to proceed on the murder case before prosecuting the assault charge, the trial court instructed lead counsel to obtain Dr. Caruso's report on the murder case within sixty days. Dr. Caruso informed lead counsel that he would not be able to complete the report within that timeframe and provided lead counsel with "a draft report" on May 11, 2009; this report included the Petitioner's first narrative of events that the victim owed him money for marijuana, that he propositioned her for sex instead, that she slapped him, and that he attacked the victim. Lead counsel had not previously heard this version, though he had visited the Petitioner some forty-four times, so lead counsel informed Dr. Caruso that he believed that the narrative was inaccurate. When lead counsel asked the Petitioner about this narrative, the Petitioner told him that he had lied because he did not want to be viewed as being "crazy and a monster," and he indicated that this narrative made him seem less crazy.

Dr. Caruso later re-interviewed the Petitioner, but lead counsel insisted that he did not tell Dr. Caruso to change the report. Lead counsel believed that the report Dr. Caruso thereafter issued on June 2, 2009, was the "original report." In this report, the Petitioner provided a narrative consistent with the narrative the Petitioner had provided to the defense team that he parked away from the house, that he lurked in the shadows when he saw a car pull up, and that he mistook the victim for the Petitioner's girlfriend's ex-boyfriend when he attacked. Lead counsel acknowledged that this report contained no reference to the initial narrative given by the Petitioner to Dr. Caruso. Dr. Caruso also filed psychiatric evaluation addendums on September 16, 2010, and October 21, 2011.

Lead counsel maintained that he forgot about Dr. Caruso's draft report until it was brought to his attention during the Petitioner's trial; thereafter, the defense received a one-day continuance. During this time, they discussed their options, which included not

pursuing an insanity defense. According to lead counsel, they believed that the Administrative Office of the Courts would not approve payment for another expert mid-trial, and they also believed that they "had a fairly good chance" the trial court would not allow the prosecutor to ask Dr. Caruso about his academic misconduct due to its age. Ultimately, they proceeded with the insanity defense and developed a plan for how Dr. Caruso would explain that the first narrative, or what they termed the "motive version." Co-counsel acknowledged that Dr. Caruso's opinion regarding the Petitioner's mental health was supported by other evidence presented at trial. Nonetheless, both lead counsel and co-counsel believed that Dr. Caruso lost credibility with the jury due to evidence of his misconduct at Cornell and due to the circumstances surrounding the draft report.

When lead counsel was asked what he could have done differently with regards to how he handled Dr. Caruso, lead counsel stated that he could have had Dr. Caruso discuss the motive version in subsequent reports and explain why that version was not accurate and was instead consistent with someone who suffered from schizoaffective disorder. Co-counsel opined that if this had been done, Dr. Caruso might have maintained a better level of credibility with the jury. Co-counsel indicated that even if they had fired Dr. Caruso and hired a new expert prior to trial, they still likely would have been under an ethical obligation to turn over all of the reports and materials from Dr. Caruso to the subsequent expert.

Relative to the Board of Professional Responsibility's ("the Board") inquiry into the prosecutor, lead counsel testified that during his representation of the Petitioner, he made a specific discovery request of the State, seeking letters that the Petitioner had written to various individuals, as well as the victim's journal. According to lead counsel, the Petitioner was not being forthcoming with the defense team at that time. Lead counsel averred that the prosecutor, despite never turning over these materials, informed the trial court that it had complied with Brady and its discovery responsibilities.

However, "maybe" two years later at a subsequent February 28, 2011 hearing, the State again indicated that it had complied with its discovery duties, but when the parties opened sealed materials in chambers that had been submitted to the mental health facility where the Petitioner received care and was evaluated, the State had included the letters and diary in those documents. Thereafter, the trial court ordered that those materials be turned over to the defense.

Lead counsel further noted that at that time, the prosecutor acknowledged that she possessed more than 100 recordings of telephone calls that the Petitioner had made while he was in jail and that were subject to disclosure, though she declined to turn them over previously because she did not want the Petitioner to know he was being monitored. Lead counsel stated that he asked the court, "[D]o you understand that what she's saying is[, that] in order to gain a tactical advantage, she did not comply with Rule 16 and with

Brady?" Lead counsel also indicated to the court that it would not have time to listen to all of the recordings before the set trial date. The trial court ordered the State to identify the calls it intended to use at trial, which were ten, and turn them over to the defense. Thereafter, the trial was continued. Ultimately, the State did not use any of the recordings at trial.

Approximately three weeks before trial, the Board contacted lead counsel and stated that it was looking into the prosecutor for her actions in this case and wanted to ask some questions. The Board asked lead counsel to submit a transcript of the hearing where the prosecutor indicated that she was trying to obtain a tactical advantage by withholding discovery materials. Lead counsel agreed that he wrote three letters to the Board in support of the prosecutor, opining that she had not acted unethically.

According to lead counsel, he understood his response to the Board to be mandatory. In addition, lead counsel agreed that he did not discuss the Board's inquiry with the Petitioner, explaining that the existence of the investigation was confidential and that the Board's disciplinary counsel told him not to share the facts of the investigation. Lead counsel insisted that there was no actual conflict of interest, and he viewed his obligation to keep the Petitioner reasonably apprised of things developing in his case as "disconnected" from this discovery issue. According to lead counsel, his failure to seek disqualification of the prosecutor did not result in prejudice to the Petitioner.

Relative to the failure to object to Dr. Farooque's testimony suggesting that the Petitioner would be released into the community if he were found not guilty by reason of insanity, lead counsel indicated that the objectionable testimony occurred while co-counsel was cross-examining Dr. Farooque.[4] Lead counsel opined that the defense, nevertheless, should have objected to this testimony, despite the fact that Dr. Farooque's testimony was a correct statement of the law. Co-counsel described Dr. Frooque's testimony that the Petitioner was "not committable" as problematic, and he believed that had he been properly apprised of the law, then he would have objected to the testimony. Co-counsel indicated that he became aware of the legal issues after trial and raised the issue in the motion for new trial.

Nonetheless, lead counsel agreed that Dr. Farooque was presented as a rebuttal witness and that the defense elicited testimony from Dr. Caruso about the fact that the Petitioner would be locked up in a mental facility indefinitely if the jury returned a verdict of not guilty by reason of insanity. Likewise, co-counsel confirmed that Dr. Farooque was responding to what the defense did "in opening the same door that Dr. Caruso had already walked through." Lead counsel and co-counsel acknowledged that it was a tactical

---

[4] The direct appeal opinion, as well as the trial transcript, indicate that this testimony was actually solicited by the State. See Johnson, 2015 WL 913657, at *28-29.

decision to present this information from Dr. Caruso to the jury and that they did so in an effort to dissuade the jury from believing that the Petitioner was psychotic but that he would be released if his insanity defense were accepted.

Relative to the trial court's conflict of interest, during an early court appearance, the trial court informed the attorneys that she had a potential conflict of interest. The trial judge explained that her nephew was dating a girl, who bartended at the restaurant where the victim worked, and that this girl was a potential witness given that she was working with the victim on the evening prior to the victim's murder. Lead counsel recalled that the Petitioner inquired what the trial court was talking about and that he told the Petitioner, "Don't worry about it, we're in the court we want to be in." Lead counsel testified that the exchange did not last five seconds and that was the last time the issue was discussed. According to lead counsel, the situation was not a viable conflict of interest that needed to be addressed. Lead counsel indicated that the trial result would not have been different had the Petitioner been in front of a different judge, and lead counsel did not believe the trial judge's rulings were impacted by any conflict of interest.

The Petitioner also presented testimony from Dr. Katherine Smith, a licensed psychologist; she testified, as an expert "in forensic examinations, competency, and insanity." She testified that she usually prepared a report titled "draft report" for the defense attorneys to review and relied on them to request a final report. In addition, she opined that Dr. Caruso should have incorporated the changed narrative into his subsequent reports and that his failure to do so was an ethical violation. Dr. Smith indicated that based upon her review of the trial transcript, Dr. Caruso lost credibility based upon the different reports. Dr. Smith agreed, however, that Dr. Caruso would have been ethically obligated to turn over his materials, including any narrative that the Petitioner had provided, to any psychologist who conducted a subsequent evaluation.

At the conclusion of the hearing, the post-conviction court noted that the "major issue here [was] whether or not to be effective [trial counsel] should have asked . . . for funding for a different expert." The post-conviction court requested that both parties submit briefs on the issues of: "(1) whether Dr. Caruso's reports regarding [the Petitioner's] mental state at the time of the offense would have been subject to disclosure to a successor defense expert; and (2) [what were trial counsels'] ethical obligations regarding engaging an expert witness." No arguments were made by either side, and no other issues were mentioned by the post-conviction court. Briefs were to be filed by December 14, 2018, and once these additional briefs were received, the post-conviction court would issue an order within sixty days ruling on the Petitioner's petition for post-conviction relief.

The Petitioner's post-hearing brief was filed on December 14, 2018; however, no additional brief from the State was included in the technical record. On February 26, 2019, the post-conviction court entered a written order denying relief. At the outset of the order,

the post-conviction court recounted the procedural history of the case and law governing ineffective assistance of counsel. The post-conviction court then stated that "the question of the [P]etitioner's sanity, or lack thereof, was hotly contested" at the Petitioner's trial. According to the post-conviction court, the Petitioner raised two claims of ineffective assistance of counsel:

> The [P]etitioner now asserts his trial counsel provided ineffective assistance of counsel in two particulars, to wit: (1) By counsel's failure to properly vet defense expert, Dr. Keith Caruso; and/or (2) By counsel's handling of the narrative/initial report prepared by Dr. Caruso (which was premised upon [the Petitioner's] version of how the murder transpired).

In addressing these two issues, the post-conviction court found that although "Dr. Caruso's testimony was of vital importance to the defense," his testimony "was far from the only evidence presented" in support of the Petitioner's insanity defense. The post-conviction court noted that the defense also presented testimony from the Petitioner's parents, Dr. Demick, and Dr. Spica, and that the parties stipulated to the admission of the victim's journal entry.

The post-conviction court further observed that trial counsel collectively had over sixty years of combined experience in the criminal justice system, had defended hundreds of homicide cases, and "were among the most competent and experienced trial attorneys in this [S]tate." The post-conviction court acknowledged lead counsel's testimony that he sought recommendations from other well-known attorneys when selecting Dr.Caruso and stated that the record established that Dr. Caruso testified and was accepted as an expert on multiple occasions prior to this case.

The post-conviction court surmised,

> [W]hat the [P]etitioner now advocates, if accepted, would establish an amazingly high benchmark for any attorney to meet when attempting to select an expert. In essence, the [P]etitioner argues that trial counsel should not be accorded deference in the selection of an expert if it is later discovered that expert was tainted in any material way. While the [P]etitioner is correct in his assertion that trial counsel must vet an expert, holding trial counsel responsible for any blemish that may thereafter appear upon that expert is not mandated by either the State Constitution, nor by the Federal constitution.

The court concluded that trial counsel were "diligent" in their selection of Dr. Caruso. The court reasoned that the Petitioner provided the "differing" narrative through no fault of trial counsel, and "once this narrative was given, [the] defense was burdened with the narrative

whether through the testimony of Dr. Caruso, the advocacy of trial counsel, or through a successor to one or both."

In the post-conviction court's estimation, the Petitioner received the effective assistance of trial counsel. After observing that the Petitioner's insanity defense "was hard fought and litigated" over the course of the ten-day trial, the post-conviction court stated in conclusion, "Nothing trial counsel did, or did not do, . . . calls into question the validity of the result reached by the jury." That concluded the order, and this timely appeal followed.

## ANALYSIS

On appeal, the Petitioner again maintains his ineffective assistance of counsel claims. Specifically, he raises the following allegations: (1) "Lead counsel was ineffective for failing to select and vet a credible expert witness to support [the Petitioner's] insanity defense"; (2) "Lead counsel and co-counsel were ineffective in preparing and presenting expert witness testimony and reports that were not credible"; (3) "Lead counsel failed to advise [the Petitioner] concerning the Board of Professional Responsibility inquiry into the [p]rosecutor and move for disqualification"; (4) "Lead counsel created an actual conflict of interest by supporting the [p]rosecutor during the Board of Professional Responsibility inquiry and failing to advise [the Petitioner] of [the] conflict"; (5) "Co-counsel failed to lodge a contemporaneous objection when [Dr. Farooque] testified that [the Petitioner] would not be confined"; (6) "Lead counsel failed to adequately advise [the Petitioner] of the trial court's conflict of interest"; and (7) "Even if [the Petitioner's] defense team's errors do not individually amount to ineffective assistance of counsel, cumulatively, the aforementioned errors warrant relief." The State responds that the Petitioner's ineffective assistance claims do not entitle him to relief.

As a threshold issue, the Petitioner notes that the post-conviction court failed to make sufficient findings regarding all of his issues to enable appellate review. He asks that we remand "the remaining issues that were raised in his [a]mended [p]etition but not addressed in the post-conviction court's final order" to the post-conviction court "with instructions to issue written findings of fact and conclusions of law as to each issue as required" by Tennessee Code Annotated section 40-30-111(b). The State responds that the record is sufficient to effectuate meaningful appellate review because it "includes transcripts of the [P]etitioner's original trial and the evidentiary hearing on his post-conviction petition." According to the State, "[t]he record also includes the post-conviction court's findings on related claims of ineffective assistance of counsel and its conclusion that 'Nothing trial counsel did, or did not do, . . . calls into question the validity of the result reached by the jury.'" Thus, in the State's estimation, a remand for "a more thorough final order" is unnecessary.

When determining the merits of a post-conviction petition, the Post-Conviction Procedure Act requires the post-conviction court to make written findings of fact and conclusions of law. A trial court's final disposition of a petition for post-conviction relief "shall set forth in the order or a written memorandum of the case all grounds presented, and shall state the findings of fact and conclusions of law with regard to each such ground." Tenn. Code Ann. § 40-30-111(b) (emphasis added). The use of the word "shall" clearly indicates the Tennessee General Assembly intended that the duty of the post-conviction court to make findings of fact to be mandatory. Donald Mays v. State, No. W2003-02761-CCA-R3-PC, 2004 WL 2439255, at *6 (Tenn. Crim. App. Oct. 28, 2004). Not only do the post-conviction court's findings of fact facilitate appellate review but, in many cases, they are necessary for such review. Id. Where the post-conviction court fails to make "a clear and detailed finding of fact," either orally or on the record, the appellate court is "at a complete loss to know the basis of the trial judge's decision and judgment; assignments of error and appellate review are seriously frustrated if not completely thwarted by lack of a definitive finding of fact by the trial judge." Brown v. State, 445 S.W.2d 669, 671 (Tenn. Crim. App. 1969).

In the case before us, the post-conviction court's order only addresses the issues involving Dr. Caruso and the presentation of the Petitioner's insanity defense. We note that no oral ruling was made from the bench on those issues or any of the other issues raised. Moreover, the post-conviction court's order does not recount the evidence and testimony presented at the post-conviction hearing in any fashion and states specifically that the Petitioner raised two claims of ineffective assistance of counsel, which it proceeds to address. Despite the State's assertion to the contrary, we agree with the Petitioner that "[n]othing in the post-conviction court's order indicates that the final sentence of the order was intended to address all remaining claims." Were we to conclude that under these circumstances, the record is sufficient to enable meaningful appellate review because the transcripts of the trial and post-conviction hearing are included in the appellate record, we would effectively nullify the "shall" language of Tennessee Code Annotated section 40-30-111(b). Again, we reiterate that this section requires that the order shall set forth "all grounds presented" and "state the findings of fact and conclusions of law with regard to each such ground." Tenn. Code Ann. § 40-30-111(b).

We conclude that the record is devoid of any findings of fact and conclusions of law with regards to the Petitioner's remaining issues that were clearly stated in the amended petition for post-conviction relief and raised by the testimony at the post-conviction hearing. These include issues touching on the Board of Professional Responsibility's inquiry into the prosecutor and lead counsel's role in that inquiry, as well as lead counsel's obligations to advise the Petitioner regarding the inquiry and move for disqualification of the prosecutor; the lack of an objection to Dr. Farooque's testimony that the Petitioner was not committable and what was required to commit someone after a verdict of not guilty by

- 13 -

reason of insanity, suggesting that the Petitioner might be released into the community if the jury rendered such a verdict; and the trial court's alleged conflict of interest and whether the Petitioner was adequately advised of those circumstances. In addition, the Petitioner raises an allegation of cumulative error due to trial counsels' ineffectiveness.

We take this opportunity to point out that "findings of fact" are the post-conviction court's opportunity to fulfill its responsibility to sort through all the evidence and set forth what actually happened, as opposed to just each witness's version of what happened. See Charles Bradford Stewart v. State, No. M2015-02449-CCA-R3-PC, 2017 WL 2645651, at *14 (Tenn. Crim. App. June 20, 2017). Without sufficient factual findings and conclusions of law, we are unable to properly address the merits of Petitioner's claims. See, e.g., Casey Colbert v. State, No. W2019-00383-CCA-R3-PC, 2020 WL 2394141, at *16 (Tenn. Crim. App. May 12, 2020); Steven Tyler Nabi v. State, No. M2017-00041-CCA-R3-PC, 2018 WL 1721869, at *4 (Tenn. Crim. App. Apr. 9, 2018) (both reaching a similar conclusion). Because ineffective assistance of counsel is a single ground for relief, because the Petitioner raises a claim of cumulative error in this regard, and because if the Petitioner were to be granted relief based upon his ineffective assistance allegations, he would receive a new trial, we decline to piecemeal these proceedings and, accordingly, believe a complete remand to be in order.

## CONCLUSION

Accordingly, we reverse the judgment of the post-conviction court and remand for further proceedings consistent with this opinion. After an order is entered in compliance with the requirements of the post-conviction statutes and this opinion, the losing party shall be entitled to initiate an appeal in accordance with the Tennessee Rules of Appellate Procedure.

_____
D. KELLY THOMAS, JR., JUDGE

- 14 -